## DAKOTA CENTRAL TELEPHONE COMPANY ET AL. *v.* STATE OF SOUTH DAKOTA EX REL. PAYNE, ATTORNEY GENERAL, ET AL.

ERROR TO THE SUPREME COURT OF THE STATE OF SOUTH DAKOTA.

No. 967. Argued May 5, 6, 1919.—Decided June 2, 1919.

The Joint Resolution of July 16, 1918, c. 154, 40 Stat. 904, authorizing the President during the continuance of the present war, whenever he shall deem it necessary for the national security or defense, to take possession and assume control, *inter alia*, of any telephone line or any part thereof, and operate it as may be needful or desirable for the duration of the war, is within the war power of Congress. P. 183. *Northern Pacific Ry. Co.* v. *North Dakota, ante*, 135.

Whether the exercise of the power so conferred was justified by the conditions at the time, or was actuated by proper motives, are questions of executive discretion not within the cognizance of the judiciary, under the Constitution. Pp. 184, 187.

The Joint Resolution, *supra*, authorized the complete possession, control and operation of telephone lines by the United States, including the fixing of rates for local service, as brought about through the President's Proclamation of July 22, 1918, and the action of the Postmaster General thereunder, whereby the United States, under

contracts with the owning companies, took over their entire business and became entitled to the revenues therefrom, and fixed the rates; and this was subsequently recognized by the Act of October 30, 1918, c. 197, 40 Stat. 1017. P. 184.

The Joint Resolution, *supra*, provides that nothing therein "shall be construed to amend, repeal, impair, or affect existing laws or powers of the States in relation to taxation" or their "lawful police regulations . . . , except wherein such laws, powers, or regulations may affect the transmission of Government communications, or the issue of stocks and bonds by such system or systems." *Held*, that police power here reserved does not include the authority to make local rates, which the resolution as a whole by clear implication transfers to the United States; and that the provision as to stocks and bonds does not justify a contrary construction. P. 185.

There can be no presumption that the state rate-making power was to continue after the telephone lines and business, including the revenues, were completely taken over by the United States and were being operated as federal instrumentalities, under the war power. P. 187. *Northern Pacific Ry. Co.* v. *North Dakota, ante,* 135.

An erroneous judgment directly affecting the United States, reversed on the merits, see *Northern Pacific Ry. Co.* v. *North Dakota, ante,* 135.

171 N. W. Rep. 277, reversed.

THE case is stated in the opinion.

*The Solicitor General* for plaintiffs in error (and for respondent in *Macleod* v. *New England Telephone & Telegraph Co., post,* 195.)

These suits are in effect against the United States and therefore not within the jurisdiction of the courts. They seek an injunction which, if granted, will restrain the United States in the use of property, its right to possession and operation of which is not attacked, and would compel the United States to furnish service, at risk of loss, on rates it has superseded. The defendants are operating as appointees and agents of the Government. They have no personal interest in the result. Their compensation as owners of the property is fixed. If the granting of the injunction sought should require the Government to operate these properties at a loss, the loss must be borne by

the Government. *Stanley* v. *Schwalby,* 162 U. S. 255, 270; *International Postal Supply Co.* v. *Bruce,* 194 U. S. 601; *Louisiana* v. *McAdoo,* 234 U. S. 627; *Goldberg* v. *Daniels,* 231 U. S. 218, 221, 222; *Hopkins* v. *Clemson College,* 221 U. S. 636, 642, 648; *Cunningham* v. *Macon & Brunswick R. R. Co.,* 109 U. S. 446, 456; *Wells* v. *Roper,* 246 U. S. 335; *Pennoyer* v. *McConnaughy,* 140 U. S. 1, 16, 17.

These cases are unlike those where an officer in excess of authority is invading the property of another or is withholding property from another to which the other person has a right, and are therefore different from such cases as *School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605; *United States* v. *Lee,* 106 U. S. 196.

The purpose and effect of the joint resolution and proclamation was completely and exclusively to vest the possession and control of defendants' telephone systems in the President through the Postmaster General as his appointee on behalf of the United States.

The taking possession and assuming control and operation by the President under the joint resolution, constituted said systems public utilities operated by the Government, and made it the right and duty of the President and his representative to fix the charge to be paid for service.

The operation of the lines thus became a part of the war activities of the Government,—the utilization of the public utilities in its prosecution. *Ex parte Milligan,* 4 Wall. 2; *Legal Tender Cases,* 12 Wall. 457; *Stewart* v. *Kahn,* 11 Wall. 493.

Where the works of a common carrier are used by the Government to carry on a service which is used by the community, such as cars for carrying the mail, and the carrier is utilized to conduct such business, the carrier is as to it a servant of the Government and not a common carrier conducting the business as part of its business, and the rules of law prevailing between private parties

do not fix the relations of the parties. *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States,* 225 U. S. 640, 649; *State of Alabama* v. *Burleson,* 82 So. Rep. 458; *Pensacola Tel. Co.* v. *Western Union Tel. Co.,* 96 U. S. 1, 9, 10; *Attorney General* v. *Edison Telephone Co. of London,* L. R. 6 Q. B. 244; *Railroad Commission of Louisiana* v. *Cumberland Telephone & Telegraph Co.* (Supreme Court of Louisiana.)

No police power of the State is impaired or affected by not submitting the rates fixed by the officers of the United States to state control, because not only the police regulations of the State do not affect rates made by the Government itself, but the police power does not extend to such a subject. The public has acted and fixed the rate when the public officer of the United States fixed it. The interest of the United States in this property is not private but public, and its protection would be the rule of law that the powers of a State do not extend to interference with the United States in the use of its property

The proviso to the resolution respecting the laws and powers of the States in relation to taxation or the lawful police regulations of the several States does not apply to and cover either the taxation of the United States or the regulation of prices to be charged by it for its operation of said property. If the United States was, prior to the adoption of this resolution, not subject itself to be taxed by a State in respect to property owned by it, or income therefrom, this proviso did not propose to enlarge the power of the State by subjecting the United States to such taxation. All it proposed to do was to protect the "existing laws or powers of the States in relation to taxation" from being impaired. The utmost which the resolution purported to do was to provide for the United States acquiring a right of temporary possession, control, and operation of the telegraph, telephone, etc., systems, for which it should pay. This still left the then owners of the prop-

erty as owners; and as between themselves and the United States, as a quasi-tenant, the owners are responsible to the State for, and bound to pay, the taxes thereon.

If the income of the corporation owning the telephone system was subject to taxation, then under this proviso whatever the United States Government pays to it for the use of the property would remain subject to the state income tax.' It can claim no exemption because of its source.

So with the police regulations of the State, where the owner of a public-service corporation rents its property to another, such landlord still remains liable to the State for the observance of all police regulations in the primary and ordinary sense of that term, as contradistinguished from the wide definition sometimes given to the words "police power," and can not plead the renting as relieving it from liability. *Railroad Company* v. *Brown*, 17 Wall. 445, 450. But in this case it was the United States—a non-suable person, one not amenable to state jurisdiction—who was about to be put into possession and to operate the properties. The taking was, in a sense, compulsory and this might raise a question of the application of the rule. Hence, it was provided that such lessee in the conduct of its property should observe the regulations for the benefit of the safety, health, and morals of the community, which were considered as always resting upon the property, regardless of who was operating it. An exception, however, was made in favor of government messages, because these might be of such urgency in the direct conduct of the war, or the administration of the Government during the war, as to override all regulations, because of urgency. The other exception also points to the fact that only such police regulations as would continue to affect the duty and obligation of the owner of the property and not the interests of the United States, were continued to the States. It was important, in order to continue the

systems unimpaired in efficiency, and especially in condition to be restored in proper financial condition to the owners, that such systems should be able to finance themselves during this period where necessary under the then existing federal regulations as to bond and stock issues. Many of the States had heavy taxes on issues of securities, even renewed bonds, (*Union Pacific R. R. Co.* v. *Public Service Commission*, 248 U. S. 67), and also police regulations such as the Blue Sky Laws, intended to protect the public against overcapitalization, fraudulent stock issues, and the like. These provisions are often calculated to delay the issue of stocks and bonds even where haste is desirable. The action of these corporations was, therefore, withdrawn to this extent from the operation of the taxing laws and lawful police regulations existing at that time in the States. Doubtless the federal regulations existing were considered sufficient.

The lawful police regulations of the several States which are not affected by the resolution of July 16, 1918, are the police regulations in their strict and accurate sense, and do not embrace the exercise of powers falling under the definition of police powers in their broadest sense. It is to be noticed that Congress, while preserving from any effect of the resolution all existing laws and powers of the State in relation to taxation, did not use the words "police power." In its broadest signification, the term "police power" is practically synonymous with the States' reserved powers of sovereignty. *License Tax Cases*, 5 How. 504, 582, 583; *Sligh* v. *Kirkwood*, 237 U. S. 52, 59. But in its primary or ordinary meaning it embraces only the power to make regulations concerning the health, safety, morals, etc., of the public. This narrower meaning is the one more often ascribed to the term. *Manigault* v. *Springs*, 199 U. S. 473, 481.

It is well settled that the police power in the primary sense cannot be bartered away. *Stone* v. *Mississippi*, 101

U. S. 814; *Northern Pacific Ry. Co.* v. *Duluth*, 208 U. S. 583, 597. It is equally well settled that a State or its local government when so empowered may make a binding contract divesting itself for a substantial period of time of the power to regulate rates. *Home Telephone Co.* v. *Los Angeles*, 211 U. S. 273; *Minneapolis* v. *Street Ry. Co.*, 215 U. S. 417.

The power to regulate rates is subject to the limitation that it must afford to a private owner of the utility a reasonable return on his property devoted to the public use. *Smyth* v. *Ames*, 169 U. S. 466; *Stanislaus County* v. *San Joaquin &c. Co.*, 192 U. S. 201. A State in the exercise of its police power in the primary sense may regulate a business to the point of suppression without making compensation. *Mugler* v. *Kansas*, 123 U. S. 623; *Chicago &c. R. R. Co.* v. *Milwaukee*, 97 Wisconsin, 418.

The phrase "police powers" is as familiar as the phrase "power of taxation," and the use of the word *powers* in the one instance and the omission of it in the other is extremely significant.

It seems clear that if Congress had intended to confer upon the States the power to regulate the rates at which the United States will furnish telephone service, it would not have expressed that intention by a reservation to the States of their "police regulations." One does not ordinarily think of a schedule of rates as a "police regulation." The field of police regulation in the primary sense as evidenced by statutes and city ordinances, regulating height of wires, placing of poles, etc., shows the wide field of action of the proviso as construed by the Postmaster General.

When the history of the times and necessities of the situation are considered, it should require very plain language to give to this proviso a meaning which would -compel these operations to be conducted, as to the most essential feature thereof, to wit, the revenues to be de-

rived therefrom to be expended in such operations not by the President and his appointees, but under the ultimate control in each State.

It is to be noticed that this resolution was approved July 16, 1918, some months after the passage of the Federal Control Act of March 21, 1918. The States would have had no more right to regulate intrastate rates without § 10 of the Federal Control Act than they have with said section in existence. The provisions of § 10, however, are very convincing as to the meaning of § 15 and of the words "the lawful police regulations" used in said section.

The meaning of these words in § 15 of the Federal Control Act is to be taken as the meaning of the same words derived from it and written into the joint resolution of July 16, 1918. *Interstate Commerce Commission* v. *Baltimore & Ohio R. R. Co.*, 145 U. S. 263; *McDonald* v. *Hovey*, 110 U. S. 619, 628.

The debate on this resolution in the Senate sustains the view that the words "lawful police regulations" were used in the ordinary and primary sense.

The provisions of state statutes providing for the regulation of rates charged by private persons and corporations operating public utilities do not by their terms apply to rates charged by agents of the Government in the operation of such utilities.

*Mr. Oliver E. Sweet*, Assistant Attorney General of the State of South Dakota, with whom *Mr. Byron S. Payne*, Attorney General of the State of South Dakota, was on the brief, for defendant in error:

The rights of telephone companies are derived from the States. The only regulation of them in the past has been by the States, under their police powers, and the making and regulating of rates with respect to intrastate operations has always been upheld as an exercise of state police power.

The controlling purpose of Congress was to unify and utilize the telephone property for the purposes of the Government in the event of an emergency such as that which paralyzed the railroads. But there is nothing in our experience to indicate in any way that the control of intrastate rates has ever been in any way needful or desirable as an aid to the Government in the prosecution of war. Under state regulation these companies had developed and extended their operations. Their rates in effect when the resolution was passed had in many instances been established after, and as a result of, exhaustive investigations by bodies authorized by law and informed by experience. In many instances those rates had received the approval of the courts. Rates established under such circumstances were entitled to the presumption that they were reasonable and fair. The purpose, therefore, of Congress in passing the resolution could not have been primarily, or even incidentally, to enable the telephone companies in time of war to increase their earnings. The controlling consideration was to facilitate the handling of governmental business, and otherwise to coördinate their facilities with other facilities under the Government's control for the more efficient conduct of the war. The regulation of intrastate rates bears no relation to this controlling purpose; and the members of Congress who voted for the resolution and discussed it in the houses of Congress were not of the view that in passing it they were authorizing administrative officers of the Federal Government to invade the domain of States' rights. The proviso unquestionably indicates that Congress gave consideration to the question of the authority of the States. If Congress had intended that the President should have the authority to initiate rates for telephone, telegraph, cable or radio systems, it could very easily have said so. When Congress passed the Federal Control Act of March 21, 1918, it authorized the Presi-

dent, under certain conditions, to initiate railroad rates. The omission of a corresponding provision in the telephone resolution indicates the intention not to confer the power to initiate telephone rates.

This controversy centers upon the construction of the words "lawful police regulations," as used in this proviso. The defendant in error contends that this language is to be interpreted in the broad sense in which police regulations and police powers have been defined by the courts in many cases in which they have considered the nature of the power exercised by the States in the regulation of the property, affairs, and rates of public utilities.

In placing upon the exercise by the States of their police regulations the limitations that the same should not affect the transmission of government communications or the issue of stocks and bonds, it is clear that Congress did not have in mind merely regulations made for the preservation of health, safety or public morals, because regulations of that character could not possibly seriously affect transmission of government communications or the issue of stocks and bonds. When it provided these limitations upon the lawful police regulations of the States it had in mind regulations which the States might make, of a character which might naturally and appreciably affect the Government's use of wire lines or the issue of securities by the telegraph and telephone companies. What Congress had in mind, and what Congress foresaw, was the possibility that a restrictive policy of rate regulation by the States might impair the credit of wire lines to such an extent that the issuance of their stocks and bonds could not be made with reasonable assurance of finding a favorable market. Because lawful police regulations is a term sufficiently broad to comprehend, not only rate regulations, but service requirements, Congress added the provision that such regulations should not affect the transmission of government communications. An unwise

policy in the regulation of rates by States might result in such a depletion of revenues as to prevent proper maintenance; or unwise requirements as to the furnishing of service for the public might interfere with the proper and necessary use by the Government for the handling of official communications. Such a purpose was entirely consistent with the main purpose of the Government in asking for control and operation during the war. The telephone companies would be greatly interested in the rates and classifications of their service in effect at the time of the termination of federal control, but during federal control the Government was to guarantee just compensation. How the Government should make good its guaranty was a matter of fiscal policy and not a matter of control or operation of the lines. In making such a guaranty the Government assumed an obligation, just as it has assumed many other obligations during the war, which it will be obliged to pay by revenues derived from one source or another. It is certain, at least, that the efficiency of governmental supervision, control or operation was not in the remotest degree dependent upon the manner in which the Government should raise the money to make its guaranty good. Congress did not say in the resolution that the funds to meet the guaranty should be raised by rates to be established by the Postmaster General. That, however, is the provision which the plaintiffs in error are now undertaking to read into the resolution by construction and interpretation. That is the only basis for their contention that the President or the Postmaster General has, or ever had, any authority to increase or otherwise regulate the rates or charges of telephone systems under federal control.

The resolution is in no sense a revenue measure. It was not passed with the legal formalities necessary in the passing of a revenue law. Nevertheless, if it means all that the plaintiffs in error contend, it is a revenue measure,

because, under their interpretation, it authorizes the collection of revenues with which the Government shall make good its guaranty of just compensation to the owners of the wire lines under its control. It is not necessary to invent any complicated construction of this language. It says that the lawful police regulations of the States shall not be affected. It was passed at a time when, under their police powers and by means of police regulations, the States had been exercising effective control over telephone companies for years.

It is a most natural assumption that if Congress had intended to completely revolutionize these conditions and the relations of the States to these utilities which they had created, Congress would unquestionably have made that intention very clear by appropriate language in the resolution. There was no occassion for inserting the term "lawful police regulations" except to assert that Congress proposed to exercise only the recognized and conceded powers of the Federal Government.

In the decisions of the courts the terms "police powers" and "police regulations" are used interchangeably and indiscriminately in many cases. If any distinction whatever is recognized it is that police regulations relate to the exercise of police powers and that through police regulations police powers are applied. We do not find in the books any authority for any other difference in the significance of these terms. *Wisconsin ex rel. Attorney General* v. *Chicago & North Western Ry. Co.*, 35 Wisconsin, 425, 591; Cooley's Constitutional Limitations, 577, 851; 31 Cyc. 903; *Smyth* v. *Ames*, 169 U. S. 466; *Hammer* v. *Dagenhart*, 247 U. S. 251; Fuller, Interstate Commerce, p. 17; *Union Dry Goods Co.* v. *Georgia Public Service Corporation*, 248 U. S. 372.

The term "lawful police regulations," as it appears in the joint resolution, has been construed in accordance with the contention of the defendant in error in decisions

rendered in the following, among other cases: *Public Service Commission of Indiana* v. *Receivers of the Central Union Telephone Co.,* Circuit Court Marion County, Indiana, decided February 21, 1919; *Indiana* v. *Indianapolis Telephone Co.,* decided in same court on same day; *Commonwealth ex rel. Attorney General* v. *Bell Telephone Co. of Pennsylvania,* Court of Common Pleas, Dauphin County, Pennsylvania, decided January 29, 1919; *Illinois* v. *Chicago Telephone Co.,* Superior Court, Cook County, Illinois; *Ohio* v. *Ohio State Telephone Co.,* Court of Common Pleas, Franklin County, Ohio, decided January 25, 1919; *Mississippi ex rel. Collins, Attorney General,* v. *Cumberland Telephone & Telegraph Co.,* 81 So. Rep. 404. A broad and liberal construction should be made of these words and of the proviso in which they are contained. The joint resolution, as a whole, is a grant of power by Congress to the President; the concluding proviso in the resolution is a limitation to that grant. It is usual that grants of power by legislation are strictly construed. Governments of enumerated and limited jurisdictions and officers possessing only powers delegated by law, are confined within the limits of the acts defining their powers. *Chesapeake & Potomac Tel. Co.* v. *Manning,* 186 U. S. 238. It is not reasonable to assume that, by making the President the general supervisor of the telephone lines, Congress intended to confer upon him, except in the matter of facilitating government communication, any greater rights in his relationship with the public than those which the telephone companies themselves possessed. We believe that there is the same need of local rate regulation and supervision by local authorities when the business is carried on by the Federal Government as when carried on by telegraph or telephone companies whose properties extend over the entire nation. This principle has been recognized when applied to railroads incorporated under federal law. *Smyth* v. *Ames,*

169 U. S. 466; *Reagan* v. *Mercantile Trust Co.*, 154 U. S. 413.

That the power to make and regulate rates of wire lines is a power which cannot be inferred but must be positively conferred by unambiguous language, is a proposition supported by many authorities. In *Reid* v. *Colorado*, 187 U. S. 137, the court said: "It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the States, even when it may do so, unless its purpose to effect that result is clearly manifested."

Congress cannot control intrastate rates under the commerce clause; nor under its war power, except when necessary and proper as a war measure. As in the case of enactments of Congress, so in the case of official acts of the President, it lies within the jurisdiction of the courts to determine whether the same are necessary and proper for carrying into execution any of his constitutional authority. *Mitchell* v. *Harmony*, 13 How. 115.

The only possible necessity for increasing the revenues of telephone companies that appears in this case is the necessity for the raising of revenues to enable the Government to compensate the telephone companies for the use of their property. That is not a war purpose. Plainly, the concluding proviso in the resolution indicates that in the opinion of Congress there existed no military necessity for increasing telephone toll rates. The President did not proclaim that it was needful or desirable to increase intrastate telephone rates as a war measure. Neither did the Postmaster General recite that such increases in telephone rates were necessary, or that they contributed in any way to the successful prosecution of the war. Such declaration or recital would not necessarily have determined the fact; if made, it would be the duty of the court in a proper proceeding to go behind such recitals, for otherwise it would be impossible to check the exercise of

arbitary power. *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94; *Philadelphia Co.* v. *Stimson*, 223 U. S. 605, 620; *Degge* v. *Hitchcock*, 229 U. S. 162, 171; *United States* v. *Lee*, 106 U. S. 196.

If the President undertook to control telephones by virtue of the war powers, the fact is that the exercise thereof, which it is the object of this case to test, was not undertaken until a time had arrived when the highest authorities of the Federal Government itself acknowledged that the war had ended. President's Messages of November 11, and December 2, 1918; *Pacific Lumber Co.* v. *Northwestern & Pacific R. R. Co.*, 51 I. C. C. 738; *United States* v. *Hicks*, 256 Fed. Rep. 707. These considerations have no bearing on the construction to be made of the joint resolution, but they have an important bearing upon the contention of the defendant that the Postmaster General's order of December 13, 1918, effective January 21, 1919, has any warrant as a war measure. Even if Congress might authorize the President to change and increase South Dakota intrastate rates under the war powers of Congress and the President, still no attempt was made to exercise such power during the war or pursuant to any war purpose or in accordance with any plan for prosecuting the war. The Postmaster General did not promulgate his order until after all necessity for the regulation of such rates as a war measure had passed.

Congress cannot confer legislative power upon the President to make rates for the future. *Field* v. *Clark*, 143 U. S. 649, 692, 693.

The suit is not one against the United States, the President or the Postmaster General; and its purpose was not to control revenue or property of the United States. The defendants are wrongdoers, and cannot defend upon the ground that they acted under orders which the President or Postmaster General was without authority to issue.

It is within the power of the court to determine the

limits of executive authority, and to restrain acts in excess thereof. This suit is not one to control administrative discretion, but to restrain acts in threatened violation of law and in excess of legal authority. *Ex parte Milligan,* 4 Wall. 2, 120, 121; *Hopkins* v. *Clemson College,* 221 U. S. 636, 643, 644; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 619, 620.

The acts of the telephone companies sought to be enjoined are not acts of the Federal Government, because beyond its powers. It is not sought in this case to control the President's discretion, because it relates to a matter wholly beyond his jurisdiction.

*Mr. William I. Schaffer,* Attorney General of the Commonwealth of Pennsylvania, and *Mr. Bernard J. Myers,* Deputy Attorney General of the Commonwealth of Pennsylvania, by leave of court, filed a brief as *amici curiæ,* on behalf of the Commonwealth of Pennsylvania.

*Mr. Charles E. Elmquist,* by leave of court, filed a brief as *amicus curiæ,* on behalf of thirty-seven States and the National Association of Railway and Utilities Commissioners.

*Mr. John J. Blaine,* Attorney General of the State of Wisconsin, *Mr. M. B. Olbrich,* Deputy Attorney General of the State of Wisconsin, and *Mr. Joseph E. Messerschmidt,* Assistant Attorney General of the State of Wisconsin, by leave of court, filed a brief as *amici curiæ,* on behalf of the State of Wisconsin.

*Mr. Hal H. Smith, Mr. David H. Crowley* and *Mr. Clarence D. Wilcox,* by leave of court, filed a brief as *amici curiæ,* on behalf of the City of Detroit.

*Mr. H. Findlay French* and *Mr. Ogle Marbury,* by leave of court, filed a brief as *amici curiæ,* on behalf of the

Protective Telephone Association of Baltimore City, Maryland, *et al.*

*Mr. Albert C. Ritchie,* Attorney General of the State of Maryland, by leave of court, filed a brief as *amicus curiæ,* on behalf of the State of Maryland.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Involving as this case does the existence of state power to regulate, without the consent of the United States, telephone rates for business done wholly within the State over lines taken over into the possession of the United States and which by the exercise of its governmental authority it operates and controls, it does not in principle differ from the *North Dakota Case* just announced [*Northern Pacific Ry. Co. v. North Dakota, ante,* 135,] where it was decided that under like conditions the State had no such power as to railroad rates. We consider this case as far as may be necessary, by a separate opinion, however, because the authority under which the control was exerted is distinct and because of the assumption in argument that this distinction begets a difference in the principles applicable.

In January, 1919, the State of South Dakota on the relation of its Attorney General and Railroad Commissioners sued the Dakota Central and other telephone companies doing business within the State to enjoin them from putting in effect a schedule of rates as to local business which it was alleged had been prepared by the Postmaster General and which it was averred the telephone companies were about to apply and enforce. It was charged that such rates were higher than those fixed by state authority and that the proposed action of the companies would be violative of state law, since the companies were under the

duty to disregard the action of the Postmaster General and apply only the lawful state rates. The duty of the relators, as state officers, to prevent such wrong was alleged,—a duty in which, it was further asserted, the State had a pecuniary interest springing from the expenditure which it was obliged to make for telephone services.

The companies answered, disclaiming all interest in the controversy on the ground that by contract, a copy of which with one of the defendant companies was annexed, their telephone lines and everything appurtenant thereto had passed into the possession and control of the United States and were being operated by it as a governmental agency. The answer also alleged that any connection of the companies through their officials or employees with the business was solely because of employment by the United States. The purpose to enforce the rates fixed by the Postmaster General was admitted and it was averred that the suit was one over which the court had no jurisdiction because it was against the United States.

The case was heard on the bill, answer, exhibits and an admission by all the parties that the contract annexed to the answer was accurate and that a similar one had been made with all the other defendants.

Assuming that Congress had power to take over the telephone lines; that it had conferred that power, upon the President; that the power had by the President been called into play conformably to the authority granted, and that the telephone lines were under the complete control of the United States, the court yet held that the State had the power to fix the local rates. In reaching this conclusion the court, assuming argumentatively that the right which the United States possessed gave at least the implied authority to fix all rates, nevertheless held that such power did not embrace intrastate rates because they had been carved out of the grant of power by Congress in conferring authority on the President. It was

therefore decided that the President, the Postmaster General and those operating the telephone service under his authority were mere wrongdoers in giving effect to the rates fixed by the Postmaster General and in refusing to enforce the conflicting intrastate rates made lawful by state law. The proceedings to prevent this wrong, it was held, did not constitute a suit against the United States and the injunction prayed was granted.

The appellees do not confine their contention to the question of statutory construction below decided. On the contrary, they press questions of power which the court below assumed and did not pass upon, and insist upon a construction of the statute contrary to that which the court below took for granted as a prelude to the question of construction upon which it based its conclusion.

We must dispose of the issues thus insisted upon before testing the soundness of the interpretation of the statute upon which the court below acted, and for the purpose of considering them as well as the question of construction which the court below expressly decided, we state the case.

On the 16th of July, 1918, Congress adopted a joint resolution (40 Stat. 904, c. 154), providing:

"That the President during the continuance of the present war is authorized and empowered, whenever he shall deem it necessary for the national security or defense, to supervise or to take possession and assume control of any telegraph, telephone, marine cable, or radio system or systems, or any part thereof, and to operate the same in such manner as may be needful or desirable for the duration of the war, which supervision, possession, control, or operation shall not extend beyond the date of the proclamation by the President of the exchange of ratifications of the treaty of peace: *Provided,* That just compensation shall be made for such supervision, possession, control, or operation, to be determined by the President:

*Provided further,* That nothing in this Act shall be construed to amend, repeal, impair, or affect existing laws or powers of the States in relation to taxation or the lawful police regulations of the several States, except wherein such laws, powers, or regulations may affect the transmission of Government communications, or the issue of stocks and bonds by such system or systems."

Six days thereafter, on the 22nd of July, the President exerted the power thus given. Its exercise was manifested by a proclamation which, after reciting the resolution of Congress, declared:

"It is deemed necessary for the national security and defense to supervise and to take possession and assume control of all telegraph and telephone systems and to operate the same in such manner as may be needful or desirable;

"Now, Therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers vested in me by the foregoing resolution, and by virtue of all other powers thereto me enabling, do hereby take possession and assume control and supervision of each and every telegraph and telephone system, and every part thereof, within the jurisdiction of the United States, including all equipment thereof and appurtenances thereto whatsoever and all materials and supplies.

"It is hereby directed that the supervision, possession, control, and operation of such telegraph and telephone systems hereby by me undertaken shall be exercised by and through the Postmaster General. . . ." [40 Stat. 1807.]

The proclamation gave to the Postmaster General plenary power to exert his authority to the extent he might deem desirable through the existing owners, managers, directors or officers of the telegraph or telephone lines, and it was provided that their services might continue as permitted by general or special orders of the Postmaster

General. It was declared that "from and after twelve o'clock midnight on the 31st day of July, 1918, all telegraph and telephone systems included in this order and proclamation shall conclusively be deemed within the possession and control and under the supervision of said Postmaster General without further act or notice."

Under this authority the Postmaster General assumed possession and control of the telephone lines and operated the same. On the 31st day of October, 1918, the President through the Postmaster General, in the execution of the duty imposed upon him by the resolution of Congress to make compensation, concluded a contract with the telephone companies of the most comprehensive character covering the whole field while the possession, control and operation by the United States continued. By its terms stipulated amounts were to be paid as consideration for the possession, control and operation by the United States and the earnings resulting from such operation became the property of the United States. Although concluded in October, 1918, by stipulation the contract related back to the time when the President took over the property.

Following this, by authority of the President, the Postmaster General fixed a general schedule of rates and it was the order to put this schedule in effect which gave rise to the suit, the trial, and the resulting judgment which we have now under consideration.

That under its war power Congress possessed the right to confer upon the President the authority which it gave him we think needs nothing here but statement, as we have disposed of that subject in the *North Dakota Railroad Rate Case*. And the completeness of the war power under which the authority was exerted and by which completeness its exercise is to be tested suffices, we think, to dispose of the many other contentions urged as to the want of power in Congress to confer upon the President the authority which it gave him.

The proposition that the President in exercising the power exceeded the authority given him is based upon two considerations. First, because there was nothing in the conditions at the time the power was exercised which justified the calling into play of the authority; indeed, the contention goes further and assails the motives which it is asserted induced the exercise of the power. But as the contention at best concerns not a want of power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power. This must be since, as this court has often pointed out, the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion.

The second contention, although it apparently rests upon the assertion that there was an absence of power in the President to exert the authority to the extent to which he did exert it, when it is correctly understood amounts only to an asserted limitation on the power granted based upon a plain misconception of the terms of the resolution of Congress by which the power was given. In other words, it assumes that by the resolution only a limited power as to the telephone lines was conferred upon the President, and hence that the assumption by him of complete possession and control was beyond the authority possessed. But although it may be conceded that there is some ground for contending, in view of the elements of authority enumerated in the resolution of Congress, that there was power given to take less than the whole if the President deemed it best to do so, we are of opinion that authority was conferred as to all the enumerated elements and that there was hence a right in the President to take complete possession and control to enable the full operation of the lines embraced in the authority. The contemporaneous official steps taken to give effect to the resolu-

tion, the proclamation of the President, the action of the Postmaster General under the authority of the President, the contracts made with the telephone companies in pursuance of authority to fix their compensation, all establish the accuracy of this view, since they all make it clear that it was assumed that power to take full control was conferred and that it was exerted so as to embrace the entire business and the right to the entire revenues to arise from the act of the United States in carrying it out. Indeed, Congress in subsequently dealing with the situation thus produced would seem to have entertained the same conception as to the scope of the power conveyed by the resolution and dealt with it from that point of view. Act of October 29, 1918, c. 197, 40 Stat. 1017.

This brings us to the proposition upon which the court based its conclusion, that is, that although complete possession, exclusive control, and the right to all the revenues derived from the operation of the business were in the United States as the result of the resolution, the proclamation, and the contracts, yet as to intrastate earnings, the state power remained to "encumber" the authority of the United States, because that situation necessarily resulted from the terms of the congressional resolution.

This superficially was based on an interpretation of the resolution, but in substance was caused by the application to the clause of the resolution interpreted, of the erroneous presumption as to the continuance of state power dealt with in the *North Dakota Case*. Let us see if this is not necessarily so. The provision dealt with was the proviso of the resolution which in the first place saved "the lawful police regulations of the several States": and therefore subjected the control of the United States to the operation of such power; and in the second place prohibited the States during the United States control from exerting authority as to the issue of stocks and bonds.

It was conceded that the words "police power" were

susceptible of two significations, a comprehensive one embracing in substance the whole field of state authority and the other a narrower one including only state power to deal with the health, safety and morals of the people. Although it was admitted that the reservation, considered intrinsically, was not susceptible of being interpreted in the broader of the two lights, it was held that it was necessary to so interpret it because of the clause of the proviso prohibiting the States from legislating concerning the issue of stocks and bonds by the companies during the United States control. The reasoning was this: It was inconceivable, it was said, that the subject, stocks and bonds, should have been withdrawn from state control by an express prohibition unless that subject would have been under state control in the absence of the prohibition, a result which could only exist by giving the saving clause as to police power its widest significance. But the fact that the rule of construction applied had the result of incorporating in the act of Congress unlimited state authority merely as the result of a prohibition by Congress against the exertion of state power in a specific instance, in and of itself admonishes of the incorrectness of the rule. But its want of foundation is established by two further considerations: (1) because it causes the provision as to stocks and bonds, which was plainly enacted to preserve the financial control of the United States over the corporations, to limit if not destroy such control; (2) because by converting the prohibition against state power into an affirmative and comprehensive grant of that power, it so interprets the act as to limit the grant of authority which the act beyond doubt gave to the United States. These considerations not only show the mistake of the interpretation, but also point out the confusion and conflict which must necessarily arise from giving effect to the mistaken presumption of the continuance of state power to which we have previously referred.

Inherently the power of a State to fix rates to be charged for intrastate carriage or transmission is in its nature but derivative, since it arises from and depends upon the duty of those engaged in intrastate commerce to charge only reasonable rates for the services by them rendered, and the authority possessed by the State to exact a compliance with that duty. Conceding that it was within the power of Congress, subject to constitutional limitations, to transplant the state power as to intrastate rates into a sphere where it, Congress, had complete control over telephone lines because it had taken possession of them and was operating them as a governmental agency, it must follow that in such sphere there would be nothing upon which the state power could be exerted except upon the power of the United States, that is, its authority to fix rates for the services which it was rendering through its governmental agencies. The anomaly resulting from such conditions adds cogency to the reasons by which in the *North Dakota Case* the error in presuming the continuance of state power in such a situation was pointed out and makes it certain that such a result could be brought about only by clear expression or at least from the most convincing implication.

This disposes of the case, but before leaving it we observe that we have not overlooked in its consideration the references made to proceedings in Congress concerning the resolution at the time of its passage, and further, that we have also considered all the suggestions made in the many and voluminous briefs filed on behalf of various state authorities and individuals having interests in suits pending elsewhere, concerning the construction of the resolution. In saying this, however, we must except suggestions as to want of wisdom or necessity for conferring the power given, or as to the precipitate or uncalled for exertion of the power as conferred, from all of which we have turned aside because the right to consider them was wholly beyond the sphere of judicial authority.

In view of our conclusion we shall in this case, as we did in the previous one and for the reasons therein stated, content ourselves with reversing the judgment below upon the merits with directions for such further proceedings as may be not inconsistent with this opinion.

*And it is so ordered.*

MR. JUSTICE BRANDEIS dissents.