### O'NEAL v. UNITED STATES.
### No. 9522.

Circuit Court of Appeals, Sixth Circuit.

Feb. 11, 1944.

---

John J. Hooker, of Nashville, Tenn. (B. H. Hagey, John J. Hooker, and Walker & Hooker, all of Nashville, Tenn., on the brief), for appellant.

Robert L. Wright, of Washington, D. C. (Horace Frierson and Fred S. Powell, both of Nashville, Tenn., and Tom C. Clark, Robert L. Wright, Fleming James, Jr., David London, and A. M. Dreyer, all of Washington, D. C., on the brief), for appellee.

Before ALLEN, MARTIN, and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

The appellant was found guilty by a jury under three counts of a criminal information charging him with (1) a purchase in violation of Title III, Section 2(a) of the Second War Powers Act of 1942, 50 U.S.C.A.Appendix § 633, and of the Revised Tire Rationing Regulations as amended; (2) a sale in violation of the same act and regulations; and (3) a sale in violation of Section 4(a) of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 904(a), and Revised Price Schedule No. 66. He was sentenced to pay a fine of $100 and to six months imprisonment under each count, the sentences under the second and third counts to run concurrently with each other and concurrently with the sentence under the first count.

Appellant attacks the judgment upon the ground (1) that Title III, Section 2(a) of the Second War Powers Act of 1942, approved March 27, 1942, c. 199, 56 Stat. 176, and the Revised Tire Rationing Regulations, are unconstitutional and void; (2) that Section 4(a) of the Emergency Price Control Act of 1942, c. 26, 56 Stat. 23, and Revised Price Schedule No. 66 are unconstitutional and void, and (3) that the Revised Tire Rationing Regulations as amended effective February 19, 1942, were superseded, revoked and repealed by Tire Rationing Regulation 1A, effective December 1, 1942.

Appellant, a police officer of the city of Nashville, Tennessee, purchased and sold four new retreaded passenger automobile tires in July, 1942. He bought the tires for $80 and resold them for $160. The selling price established by Maximum Price Regulation No. 66, theretofore issued by the Office of Price Administration (hereinafter called the O. P. A.), was approximately $10 per tire. No attempt was made by appellant nor by any of the parties to these transactions to procure the required rationing certificates. While at the trial appellant claimed that he had not understood that the regulations applied to tires which had been retreaded prior to the promulgation of the Rationing Regulations, evidence was adduced which entitled the jury to find that the appellant was fully acquainted with the regulations covering rationing and price control through his work in cooperation with the local office of O.P.A., and that his offense was therefore wilful within Title III, Section 2(a) (5) of the Second War Powers Act of 1942.

The Tire Rationing Regulations which underlie counts 1 and 2 were issued by O. P. A. on February 11, 1942, effective as of February 19, 1942. They prohibited the purchase and sale of new and recapped rubber tires and tubes except when a rationing certificate had been obtained by the purchaser and transferred to the seller. The regulations were issued pursuant to the authority granted in the federal statute, c. 157, 55 Stat. 236, approved May 31, 1941, 50 U.S.Appendix § 1152, which amended Section 2(a) of the act, approved June 28, 1940, c. 440, 54 Stat. 676. The 1940 Act authorized the establishment of priorities in the deliveries upon contracts with the Secretary of the Navy during the national emergency declared by the President. The statute was entitled in part

"An Act to expedite national defense." The 1941 Act added, among others, the following provisions:

"Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material * * * for defense or for private account or for export, the President may allocate such material in such manner * * * and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense. * * * The President may exercise any power, authority, or discretion conferred on him by this section, through such department, agency, or officer of the Government as he may direct and in conformity with any rules [and] regulations which he may prescribe."

The Act of 1940 was again amended on March 27, 1942, in the Second War Powers Act, to cover shortage of "any facilities for defense" as well as "material." The powers of the President to investigate shortages were broadened and defined in great detail. A criminal sanction was added in Title III, Section 2(a) (5), as follows:

"Any person who willfully performs any act prohibited, or willfully fails to perform any act required by, any provision of this subsection (a) or any rule, regulation, or order thereunder, whether heretofore or hereafter issued, shall be guilty of a misdemeanor, and shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both."

On August 28, 1941, by executive order the President authorized the Office of Production Management (hereinafter called O. P. M.) to perform the functions of the allocation of materials and later, by executive order transferred these functions from the O. P. M. to the War Production Board (hereinafter called W. P. B.), which agency immediately delegated general authority in matters of rationing control on the retail level to O. P. A. The directive which delegated this authority was later approved and countersigned by the President.

Title II, Section 201(b) of the Emergency Price Control Act of 1942, 50 U.S. C.A.Appendix § 921(b), expressly authorized the President "to transfer to the Office of Price Administration any of the powers and functions relating to priorities or rationing conferred by law upon any other department or agency of the Government with respect to any particular commodity or commodities."

Pursuant to these authorizations, on December 12, 1941, O. P. M. issued an order freezing the sale of tires and tubes until the issuance of rationing regulations, which were thereafter issued by O. P. A. on February 11, 1942, prior to the enactment of Title III, Section 2(a) (5). All Tire Rationing Regulations theretofore promulgated were expressly ratified by the President in the Executive Order of April 7, 1942.

Count 3 is based upon an alleged violation of Revised Price Schedule No. 66, issued by O. P. A. January 10, 1942, effective January 19, 1942. Under Title II, Section 205(b) of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 925(b), a penalty is provided for wilful violation of Title I, Section 4(a) of the Act, which prohibits any act in violation of any price schedule.

Appellant's principal attack is based upon the proposition that Title III, Section 2(a) of the Second War Powers Act of 1942 and the Revised Tire Rationing Regulations as amended, and Section 4(a) of the Emergency Price Control Act of 1942 and Revised Price Schedule No. 66, are unconstitutional because the statutes delegate pure legislative power to the President.

 We think it is plain, and it is not contested that the power to allocate materials and facilities for defense and the power to control the price structure under the Constitution of the United States is legislative rather than executive. While the war power in this country is conferred on the Congress and on the President, Kiyoski Hirabayashi v. United States, 320 U. S. 81, 93, 63 S.Ct. 1375, 87 L.Ed. 1774, the principal war power of the President arises as Commander-in-Chief of the Army and Navy and does not include any war power legislative in its nature. The President also is invested with certain war powers arising out of the treaty-making power, such as the duty of negotiating treaties with our Allies. However, the power to establish shortage rationing, and the power to fix prices upon the entire range of civilian goods is neither expressly nor impliedly included in any war power of the President. Such drastic power necessarily falls within the "legislative power" with which the Congress is invested (Art. I, Section 1, U. S. Constitution).

■■ In carrying out the constitutional division of the powers, it is a breach of the fundamental law for Congress to transfer its legislative power to the President. Panama Refining Co. v. Ryan, 293 U.S. 388, 421, 55 S.Ct. 241, 79 L.Ed. 446; Di Santo v. United States, 6 Cir., 93 F.2d 948. However, the Congress in the field of its duties may invoke the action of the executive branch in so far as the action invoked is not an assumption of its own constitutional field of action. J. W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624. In this decision, which upheld legislation empowering the President to increase or decrease duties imposed by the Tariff Act of September 21, 1922, the court held that in determining what one branch of the Government may do in seeking assistance from another branch, "the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination."

■ Appellant urges that this established doctrine does not aid the validity of the statutes here attacked because, as he contends, no standards are established to which the President must conform in the exercise of the statutory powers. But Title III, Sections 2(a)(1) and 2(a)(2) of the Second War Powers Act of 1942, although terse, imposes certain definite restrictions. The President is authorized to allocate, that is to ration, critical materials and facilities only when he is "satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage." While the President is not required in so many words to make findings, he is given sweeping powers of investigation in the enforcement and administration of the statute, Title III, Section 2(a)(3), and in light of this provision we read the word "satisfied" as being equivalent to and including the word "finds." The same word, "satisfied," was used in the statute which was upheld against a similar contention in Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294. When the President is satisfied that a shortage exists, it becomes his duty to ration or allocate. But it is not the President who declares that priorities shall exist and allocations of materials and facilities be made; it is the Congress. Moreover additional standards under which the President must act are declared in the Second War Powers Act. It is true that these standards are not detailed at great length, but they are substantial. They require that when the President is satisfied that the shortage exists, allocations must be made upon conditions and to the extent that the President shall deem necessary or appropriate (1) in the public interest, and (2) to promote the national defense. The President, for instance, is not authorized to exercise this power merely because he deems it necessary or appropriate in the public interest. It must also in his opinion be necessary or appropriate in promotion of the national defense.

■ We do not consider the lack of further detailed standards as invalidating this legislation. The Congress, acting within its legislative powers, was entitled to consider the character of the emergency confronting the nation and the "inherent necessities of the governmental co-ordination." J. W. Hampton, Jr., & Co. v. United States, supra. Munitions of war essential to our defense called for all the basic materials, metals, wood stuffs, cellulose, textiles, and the broadening categories of complex chemical products. They could not be manufactured if the raw materials were not conserved, and the very existence of the nation depended upon such conservation. The observation of Chief Justice Taft in J. W. Hampton, Jr., & Co. v. United States, became critically apposite here. The problems of allocation were myriad, and if the Congress were to deal with all of them it could not exercise the power to allocate at all. While the rule against the delegation of legislative power is fixed and unalterable, not depending upon the existence of emergency, the Congress, which is authorized to empower the executive to act in accordance with due legislative standards, may exercise a discretion in the fixing of those standards. In the emergency of war, the standards must be flexible enough to permit speed and efficiency of action for the national defense. Cf. Dakota Central Telephone Co. v. State of South Dakota, 250 U.S. 163, 183, 39 S.Ct. 507, 63 L.Ed. 910, 4 A.L.R. 1623; United States v. Chemical Foundation, Inc., 272 U.S. 1, 12, 47 S.Ct. 1, 71 L.Ed. 131. It was pointed out in the latter case that it was not necessary for the Congress to deal with each case and that the Act went as far as was reasonably practical under the existing circumstances. That the desired result of speed and efficiency of action has been attained by the rationing of materials and facilities under the Second War Powers

Act of 1942 is demonstrated by the triumphant record of the American war industry. Since the President cannot order the allocations except as he deems it necessary or appropriate in the public interest and for the common defense, which are drastic limitations, we think that no illegal delegation of legislative power exists, and the Act is valid. This conclusion is squarely supported by Sunshine Coal Co. v. Adkins, 310 U.S. 381, 397, 60 S.Ct. 907, 84 L.Ed. 1263.

Nor does the wide discretion confided in the President in the Second War Powers Act of 1942 invalidate the statute. While he is authorized to make the allocations in such manner and to such extent as he shall "deem necessary or appropriate in the public interest and to promote the national defense," similar broad delegations of power have long been held to be valid. In Field v. Clark, supra, the court discussed a number of federal statutes, including the act of June 4, 1794, 1 Stat. 372, authorizing the President "whenever, in his opinion, the public safety shall so require," and under regulations to be continued or revoked "whenever he shall think proper" to lay an embargo on all ships and vessels in the ports of the United States; the act of February 9, 1799, 1 Stat. 615, § 4, authorizing the President to remit and discontinue the congressional restriction upon commercial intercourse with the French Republic, "if he shall deem it expedient and consistent with the interest of the United States;" the act of December 19, 1806, 2 Stat. 411, § 3, authorizing the President to suspend the operation of the non-importation act of 1806 "if in his judgment the public interest should require it." Other federal statutes discussed included the act of March 6, 1866, 14 Stat. 4, § 2, authorizing the President to declare the provisions of the federal statute forbidding the importation of certain cattle and hides into this country to be inoperative "whenever in his judgment" their importation might be made without danger of spreading contagious or infectious diseases among the cattle of the United States. The court pointed out that these enactments, with their sweeping delegation of discretion to act, must be regarded as unwarranted by the Constitution if the Tariff Act under consideration in the Field case, supra, was unconstitutional, and by its decision that the act was valid, the Supreme Court in effect held that the investment of the President with such broad discretionary powers would not of itself invalidate legislation such as that in question here.

Similar considerations compel us to hold that the Emergency Price Control Act is constitutional. The standards established for the direction of the administrator are much more detailed than those established for the President in the Second War Powers Act of 1942. They are contained in Title I, Section 1(a), and Section 2(a) (c) (g) and (h) of the Act, 50 U.S. C.A. Appendix §§ 901(a), 902(a, c, g, h). The Administrator must take the steps prescribed in the Act whenever in his judgment "the price or prices of a commodity or commodities have risen or threaten to rise" in a manner inconsistent with the purposes of the statute. The maximum prices must be generally fair and equitable and effectuate the purpose of the Act, and a specific period, namely, that between October 1 and October 15, 1941, is fixed as the period by which the Administrator is ordinarily to be guided in fixing price levels. The Administrator is required to make adjustments for certain specific relevant factors, and is given power to make reasonable exceptions wherever necessary or proper. Clearly there is no unlawful delegation of legislative power in this statute. Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; Sunshine Coal Co. v. Adkins, supra; Opp Cotton Mills v. Administrator, 312 U. S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624; Rottenberg v. United States, 1 Cir., 137 F.2d 850, 858; Di Santo v. United States, supra.

Other contentions require only a brief discussion. Since it is not unconstitutional for Congress to invest the President with the power of allocation, it follows that the express provision giving him authority in turn to delegate these powers to other administrative boards or officials is valid. Kiyoshi Hirabayashi v. United States, supra.

The contention that W. P. B. had no authority to delegate powers to O. P. A. has no merit when we consider that Congress expressly authorized the O. P. A. to exercise these powers and the President himself expressly delegated to O. P. A. all powers of rationing under the Act.

Nor does the fact that the amended regulations violated by the appellant were later revised by the O. P. A. bar criminal prosecution for the prior violation.

914

Revocation of the regulation did not repeal the statute. United States v. Hark, 64 S.Ct. 359, decided January 3, 1944. Even if due to the revision the original regulations ceased to be a rule for the future, they did not cease to be the law for the antecedent period of time. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255.

The judgment is affirmed.