**CARTER v. BOWLES.**

No. 462.

District Court, W. D. South Carolina.

July 14, 1944.

J. Venable Jester and C. S. Bowen, both of Greenville, S. C., for plaintiff.

Fleming James, Jr., Director Litigation Division, O. P. A., George Austin, Chief Civil Litigation Branch, O. P. A., and Harry L. Shniderman, Atty. O. P. A., all of Washington, D. C., and Charles B. Elliott, of Columbia, S. C., District Enforcement Atty., O. P. A., for defendant.

Before PARKER, Circuit Judge, and WYCHE and TIMMERMAN, District Judges.

PARKER, Circuit Judge.

This is a suit to enjoin the enforcement of a suspension order entered by a Hearing Administrator of the Office of Price Administration on an appeal from a Hearing Commissioner. The effect of the order, as modified on appeal, is to prevent the plaintiff, the owner of a gasoline filling station, from dealing in gasoline for a period of sixty days. The order is an allocation order entered under the provisions of the Second War Powers Act, 56 Stat. 178, 50 U.S.C.A.Appendix, § 633, and as modified on appeal is much less drastic than as originally entered. Injunction is asked on the grounds, (1) that the suspension order is not authorized by the statute and (2) that, if so authorized, the statute is unconstitutional. A court of three judges has been constituted pur-

suant to the act of August 24, 1937, c. 754, 50 Stat. 752, 28 U.S.C.A. § 380a and the case has been submitted for final decree upon the pleadings and the evidence taken before the Hearing Commissioner. The facts out of which the controversy arises are well stated and the evidence supporting the action of the Hearing Administrator is well analyzed in the following excerpt from the decision on appeal:

"The Notice of Hearing charged respondent with having accepted and possessed counterfeit gasoline ration coupons between the dates of February 1, 1944 and March 25, 1944, and with having during that period transferred the same to his supplier in exchange for gasoline.

"The Hearing Commissioner found that respondent had delivered to his supplier 14 gummed sheets (OPA Form R-120) containing 537 gasoline ration coupons of which 195 Class A-9 coupons and 98 Class B-2 coupons were counterfeit. It appears that respondent had commenced operation of the station involved on February 1, 1944, and that these sheets were delivered by him to his supplier in exchange for gasoline and deposited by the supplier in its ration bank account on various dates between February 12, 1944, and March 21, 1944. The Hearing Commissioner concluded therefrom that respondent, between February 1, 1944 and March 25, 1944, had unlawfully acquired and possessed these counterfeit coupons, which, if valid, would have had a gallonage value of 1,075 gallons, and that in transferring them to his supplier in exchange for gasoline respondent had wilfully violated Section 1300.8178(c) of Ration Order 5C, which makes it a violation to acquire, possess or transfer counterfeit gasoline ration coupons. * * *

"An examination of the gummed sheets, which were admitted into evidence, reveals that the large majority of the 293 counterfeit coupons, and many of the valid ones, had only one of the two notations required to be endorsed on coupons by the regulations, i. e., the purported license numbers of vehicles into which respondent or his employees had supposedly transferred gasoline were endorsed thereon. It would thus appear that respondent and his employees had been accepting improperly endorsed coupons, since the regulations also require that these coupons be endorsed with the state of registration of the vehicles in-

to which gasoline is transferred. A further examination, however, reveals that these license numbers, although purporting to represent different vehicles, were all endorsed in the same handwriting. The conclusion follows, despite respondent's assertion that he or his employees rarely accepted unendorsed coupons, that these counterfeit coupons, as well as many valid ones, though now bearing notations of purported license numbers, were accepted without any endorsements whatsoever thereon and that thereafter respondent or someone on his behalf made the notations.

"The respondent, having commenced business on February 1, 1944, the acquisition of such a large number of counterfeit coupons within only seven weeks thereafter, coupled with the circumstance that such notations as appeared thereon were all made in the same handwriting, tends to establish that they were not acquired in normal ration channels. However, viewing the evidence in the light most favorable to respondent, the wholesale acceptance of unendorsed coupons, at the least, establishes that respondent's station was conducted in such a grossly negligent manner that it thereby became a conduit for the flow of counterfeited coupons and the consequent illegal diversion of gasoline.

"Had respondent strictly conformed to the requirements of the gasoline rationing regulations relating to the transfer of gasoline, counterfeit coupons could not have been foisted upon him. Under the gasoline rationing regulations a station operator must require that each customer, simultaneously with the transfer of gasoline, present the gasoline ration issued by a War Price and Rationing Board for the vehicle into which the gasoline is transferred, and the station operator shall then remove therefrom coupons of appropriate gallonage value which have previously been endorsed with the required notations. If an operator adheres to these requirements of the regulations his acquisition of counterfeit coupons is most improbable. The indiscriminate acceptance of loose and unendorsed coupons tends to make a retail gasoline station a clearing house for counterfeit and invalid ration currency and related black market activities.

"Respondent's negligence having been established, there is no merit to his contention that in the absence of a wilful or intentional violation a suspension order should not issue. It is not necessary that wilfullness be established before remedial action can be taken to prevent further diversions of scarce and rationed commodities. Where, as in this case, a substantial quantity of rationed gasoline has been diverted, the harm to the wartime rationing program is the same whether the violation was wilful or resulted from carelessness or negligence. The 1,075 gallons of gasoline diverted from essential uses cannot be recovered and the nation's limited stock pile of a critical commodity has been depleted to that extent.

"In addition to his business at this station as a retail dealer in gasoline, respondent is engaged in the used car business and farming. Apparently, he gave but little personal attention and supervision to this station and operated it largely by and through employees. His supervision of this station seems to have been limited to 'a check' of the station each morning. He says that on these occasions he 'separated' the ration coupons but did not count them and apparently his so-called daily 'check' was rather of money collected as compared with gasoline sold than of compliance by his employees with the gasoline rationing regulations. It was incumbent upon respondent to know the essential requirements of the gasoline rationing regulations, and it must be assumed he did, yet a mere cursory examination of the coupons accepted at his station, and in evidence here, would have disclosed that either same were not endorsed at all or if the endorsement now appearing upon them had already been made that such endorsements were not in conformity with the plain and clear requirements of the regulations. Diligent supervision consonant with the responsibility respondent assumed when he elected to engage as a dealer in the distribution of gasoline, pursuant to the rationing regulations, would have disclosed continuing violations at his station.

"Respondent undertakes to disclaim responsibility for any acts of his employees in violation of the rationing regulations. We have consistently held that those who elect to participate in the war-time rationing program assume a positive, nondelegable duty to see that the scarce rationed commodities entrusted to them are distributed strictly in accordance with the applicable ration orders and regulations. Respondent may, if he chooses, entrust the operation of his business to employees, but he cannot thereby divest himself of

his obligations as a trustee of this critical and rationed commodity. The rationed gasoline was entrusted to the respondent, and not to his employees, for sale and distribution in the manner prescribed by the regulations. It is respondent, therefore, who must be held responsible for the wasteful and inefficient manner of operation which resulted in this large diversion of gasoline."

Plaintiff contends that the findings of fact upon which the order is based are not supported by the evidence; but a careful reading of the record made before the Hearing Commissioner convinces us that this point is entirely without merit. We think, also, that there can be no question but that the findings support the action approved upon appeal. The sale of so large a quantity of gasoline upon forged coupons in so short a period of time, and the circumstances which show that the person making the sales must have violated rationing regulations in accepting the coupons, thoroughly justified the suspension order. We agree with the statement of the Hearing Administrator that "those who elect to participate in the war-time rationing program assume a positive, non-delegable duty to see that the scarce rationed commodities entrusted to them are distributed strictly in accordance with the applicable ration order and regulations"; and a dealer in rationed commodities does not establish the right to continued allocation merely by showing that violations of rationing regulations which have occurred in his business were contrary to his orders and were attributable to unauthorized conduct of employees.

Allocation orders under the War Powers Act are made, not for the purpose of punishing offenders against the rationing regulations, but to secure a proper distribution of rationed commodities (Brown v. Wilemon, 5 Cir., 139 F.2d 730); and, if when viewed in the light of that purpose they are not so arbitrary and unreasonable as to evidence an abuse of discretion and are supported by substantial evidence, they should be sustained. Like other orders of administrative agencies, they are to be enforced unless they lack substantial support in the evidence upon which they are based, unless they involve error of law or unless they are so manifestly arbitrary and unreasonable as to transcend the authority conferred by the statute. Cf. Chicago, etc., R. Co. v. United States, 274 U.

S. 29, 33, 47 S.Ct. 486, 71 L.Ed. 911; United States v. New River Co., 265 U.S. 533, 540, 44 S.Ct. 610, 68 L.Ed. 1165; Anchor Coal Co. v. United States, D.C., 25 F.2d 462, 471, and cases there cited. They "must have 'warrant in the record' and a reasonable basis in the law. But 'the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.'" Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 246; Rochester Tel. Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147.

The argument that suspension orders are not authorized by the statute was fully considered and answered in the recent decision of the Supreme Court in Steuart & Bro. v. Bowles, 64 S.Ct. 1097, 1100. In that case, as in this, the contention was made that the intention of Congress was that the act should be enforced through the criminal and civil sanctions provided therein and that the authority to allocate materials should not be held to include the power to issue suspension orders of the character here involved. In replying to that contention and pointing out that a suspension order was not a means of imposing punishment for violation of the act but a means of making allocation of the rationed commodity in accordance with the act's primary purpose, the Court said:

"The problem of the scarcity of materials is often acute and critical in a great war effort such as the present one. Whether the difficulty be transportation or production, there is apt to be an insufficient supply to meet essential civilian needs after military and industrial requirements have been satisfied. Thus without rationing, the fuel tanks of a few would be full; the fuel tanks of many would be empty. Some localities would have plenty; communities less favorably situated would suffer. Allocation or rationing is designed to eliminate such inequalities and to treat all alike who are similarly situated. The burdens are thus shared equally and limited supplies are utilized for the benefit of the greatest number. But middlemen—wholesalers and retailers—bent on defying the rationing system could raise havoc with it. By disregarding quotas prescribed for each householder and by giving some more than the allotted share they would defeat the objectives of rationing and destroy any program of allocation. These middlemen are the chief if not the only conduits be-

tween the source of limited supplies and the consumers. From the viewpoint of a rationing system a middleman who distributes the product in violation and disregard of the prescribed quotas is an inefficient and wasteful conduit. If the needs of consumers are to be met and the consumer allocations are to be filled, prudence might well dictate the avoidance or discard of such inefficient and unreliable means of distribution of a scarce and vital commodity. Certainly we could not say that the President would lack the power under this Act to take away from a wasteful factory and route to an efficient one a precious supply of material needed for the manufacture of articles of war. That power of allocation or rationing might indeed be the only way of getting the right equipment to our armed forces in time. From the point of view of the factory owner from whom the materials were diverted the action would be harsh. He would be deprived of an expected profit. But in times of war the national interest cannot wait on individual claims to preference. The waging of war and the control of its attendant economic problems are urgent business. Yet if the President has the power to channel raw materials into the most efficient industrial units and thus save scarce materials from wastage it is difficult to see why the same principle is not applicable to the distribution of fuel oil.

"If petitioner established that he was eliminated as a dealer or that his quota was cut down for reasons not relevant to allocation or efficient distribution of fuel oil, quite different considerations would be presented. But we can make no such assumption here. The suspension order rests on findings of serious violations repeatedly made. These violations were obviously germane to the problem of allocation of fuel oil. For they indicated that a scarce and vital commodity was being distributed in an inefficient, inequitable and wasteful way. The character of the violations thus negatives the charge that the suspension order was designed to punish petitioner rather than to protect the distribution system and the interests of conservation. * * *

· "What we have said disposes of the argument that if petitioner has violated Ration Order No. 11 the only recourse of the government is to proceed under § 2(a) (5) or § 2(a) (6) [50 U.S.C.A.Appendix, § 633] which provide criminal and civil sanctions. Those remedies are sanctions for the power to 'allocate'. They hardly subtract from that power. Yet they would be allowed to do just that if it were held that violations by middlemen of the ration orders and regulations could never be the basis of reallocation of fuel oil into more reliable channels of distribution."

■ We entertain no doubt as to the constitutionality of the statute. That the rationing of commodities necessary to. the war effort is a proper exercise of the war power vested in Congress, and that the statute does not involve an unconstitutional delegation of legislative powers to the executive is too clear for argument. Country Garden Market v. Bowles, App.D. C., 141 F.2d 540; United States v. Randall, 2 Cir., 140 F.2d 70; O'Neal v. United States, 6 Cir., 140 F.2d 908. See also Brown v. Wright, 4 Cir., 137 F.2d 484; Henderson v. Kimmel, D.C., 47 F.Supp. 635.

■ The validity of the statute and the regulations promulgated thereunder are attacked on the ground that no provision is made by the statute itself for judicial review of administrative action taken pursuant thereto. It is well settled, however, that without special statutory provisions therefor, the courts of the United States may, in the exercise of jurisdiction conferred upon them by general statutory provisions, enjoin the enforcement of orders of executive agencies to the extent necessary "to protect justiciable individual rights against administrative action fairly beyond the granted power." Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 571. This, of course, accords judicial review to the extent necessary to protect constitutional rights; and such review plaintiff is receiving in the suit presently before the court. As said in Stark v. Wickard, supra, 321 U.S. at page 309, 310, 64 S.Ct. at page 570: "Here, there is no forum, other than the ordinary courts, to hear this complaint. When, as we have previously concluded in this opinion, definite personal rights are created by federal statute, similar in kind to those customarily treated in courts of law, the silence of Congress as to judicial review is, at any rate in the absence of an administrative remedy, not to be construed as a denial of authority to the aggrieved person to seek appropriate relief in the federal courts in the exercise of their general jurisdiction. When Con-

gress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. This permits the courts to participate in law enforcement entrusted to administrative bodies only to the extent necessary to protect justiciable individual rights against administrative action fairly beyond the granted powers. The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction. Cf. United States v. Morgan, 307 U.S. 183, 190, 191, 59 S.Ct. 795, 799, 83 L.Ed. 1211."

For the reasons stated, the injunction applied for will be denied and the suit will be dismissed.

Suit dismissed.