(C. D. 505)

Mitsui & Co. *v.* United States

United States Customs Court, First Division

(Decided May 29, 1941)

*Eugene R. Pickrell* (*Eugene A. Chase* of counsel) for the plaintiffs.
*Charles D. Lawrence*, Acting Assistant Attorney General (*Richard F. Weeks* and *Joseph F. Donohue*, special attorneys), for the defendant.

Before BROWN, TILSON, and DALLINGER, Judges; BROWN, J., not participating

DALLINGER, Judge: This is a suit against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted upon a particular importation of tuna fish packed in oil. Duty was levied thereon at the rate of 45 per centum ad valorem under the provision in paragraph 718 (a) of the Tariff Act of 1930 for "Fish, prepared or preserved in any manner, when packed in oil or in oil and other substances, 30 per centum ad valorem," which rate was increased to 45 per centum ad valorem by virtue of Presidential Proclamation, dated December 14, 1933, promulgated in T. D. 46795, 64 Treas. Dec. 708. It is claimed that said merchandise should have been assessed with duty at only 30 per centum ad valorem under said paragraph 718 (a) for the alleged reason that said Presidential Proclamation increasing the rate of duty to 45 per centum ad valorem was *ultra vires* and therefore null and void.

At the hearing, held at New York on May 8, 1940, no oral testimony was offered, the only evidence introduced by the plaintiff consisting of a certified copy of the public notice of the investigation ordered and of the hearings set to be held before the United States Tariff Commission, together with two notices of postponements of said hearing, which documents were admitted in evidence herein as collective exhibit 1; and a certified copy of Report No. 71, second series, of the United States Tariff Commission, which was admitted in evidence as exhibit 2.

Upon this record counsel for the plaintiffs in his elaborate brief filed herein contends that because of the fact that section 336 (a) of

the Tariff Act of 1930, under which the investigation in question was held by the United States Tariff Commission, provides that said Commission shall investigate the difference in the cost of production of any domestic article and any like or similar foreign article, that the commission in the instant case did not comply with the statute, for the reason that there were four different kinds of tuna fish, widely differing in their cost of production, no investigation having been made as to the comparative cost of production of each individual kind or species at home and abroad. Hence, it is argued that the Proclamation of the President based upon this alleged illegal finding of the Tariff Commission is *ultra vires* and therefore null and void.

The pertinent portion of the Presidential Proclamation as set forth in T. D. 46795, 64 Treas. Dec. 708, reads as follows:

WHEREAS under and by virtue of section 336 of title III, part II, of the act of Congress approved June 17, 1930 (46 Stat. 590, 701), entitled "An Act To provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, to protect American labor, and for other purposes", the United States Tariff Commission has investigated the differences in costs of production of, and all other facts and conditions enumerated in said section with respect to, fish, prepared or preserved in any manner, when packed in oil or in oil and other substances, being wholly or in part the growth or product of the United States and of and with respect to like or similar articles wholly or in part the growth or product of the principal competing countries;

WHEREAS in the course of said investigation hearings were held, of which reasonable public notice was given and at which parties interested were given reasonable opportunity to be present, to produce evidence, and to be heard;

WHEREAS the Commission has reported to the President the results of said investigation and its findings with respect to such differences in costs of production;

\*       \*       \*       \*       \*       \*       \*

Now, THEREFORE, I, FRANKLIN D. ROOSEVELT, President of the United States of America, do hereby approve and proclaim the following rates of duty found to be shown by said investigation to be necessary to equalize such differences in costs of production:

An increase in the rate of duty expressly fixed in paragraph 718 (a) of title I of said act on tuna fish, prepared or preserved in any manner, when packed in oil or in oil and other substances from 30 per centum ad valorem to 45 per centum ad valorem; and

\*       \*       \*       \*       \*       \*       \*

Section 336 of the Tariff Act of 1930, under which the foregoing Proclamation of the President was promulgated, reads as follows:

SEC. 336. EQUALIZATION OF COSTS OF PRODUCTION.

(a) CHANGE OF CLASSIFICATION OR DUTIES.—In order to put into force and effect the policy of Congress by this Act intended, the commission (1) upon request of the President, or (2) upon resolution of either or both Houses of Congress, or (3) upon its own motion, or (4) when in the judgment of the commission there is good and sufficient reason therefor, upon application of any interested party, shall investigate the differences in the costs of production of any domestic article and of any like or similar foreign article. In the course of the investigation

the commission shall hold hearings and give reasonable public notice thereof, and shall afford reasonable opportunity for parties interested to be present, to produce evidence, and to be heard at such hearings. The commission is authorized to adopt such reasonable procedure and rules and regulations as it deems necessary to execute its functions under this section. The commission shall report to the President the results of the investigation and its findings with respect to such differences in costs of production. If the commission finds it shown by the investigation that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic article and the like or similar foreign article when produced in the principal competing country, the commission shall specify in its report such increases or decreases in rates of duty expressly fixed by statute (including any necessary change in classification) as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total increase or decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute.

(b) CHANGE TO AMERICAN SELLING PRICE.—If the commission finds upon any such investigation that such differences can not be equalized by proceeding as hereinbefore provided, it shall so state in its report to the President and shall specify therein such ad valorem rates of duty based upon the American selling price (as defined in section 402 (g)) of the domestic article, as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute, and no such rate shall be increased.

(c) PROCLAMATION BY THE PRESIDENT.—The President shall by proclamation approve the rates of duty and changes in classification and in basis of value specified in any report of the commission under this section, if in his judgment such rates of duty and changes are shown by such investigation of the commission to be necessary to equalize such differences in costs of production.

(d) EFFECTIVE DATE OF RATES AND CHANGES.—Commencing thirty days after the date of any presidential proclamation of approval the increased or decreased rates of duty and changes in classification or in basis of value specified in the report of the commission shall take effect.

(e) ASCERTAINMENT OF DIFFERENCES IN COSTS OF PRODUCTION.—In ascertaining under this section the differences in costs of production, the commission shall take into consideration, in so far as it finds it practicable:

(1) IN THE CASE OF A DOMESTIC ARTICLE.—(A) The cost of production as hereinafter in this section defined; (B) transportation costs and other costs incident to delivery to the principal market or markets of the United States for the article; and (C) other relevant factors that constitute an advantage or disadvantage in competition.

(2) IN THE CASE OF A FOREIGN ARTICLE.—(A) The cost of production as hereinafter in this section defined, or, if the commission finds that such cost is not readily ascertainable, the commission may accept as evidence thereof, or as supplemental thereto, the weighted average of the invoice prices or values for a representative period and/or the average wholesale selling price for a representative period (which price shall be that at which the article is freely offered for sale to all purchasers in the principal market or markets of the principal competing country or countries in the ordinary course of trade and in the usual wholesale quantities in such market or markets); (B) transportation costs and other costs incident to delivery to the principal market or markets of the United States for the article; (C) other relevant factors that constitute an advantage or disadvantage in competition, including advantages granted to the foreign producers by a government, person, partnership, corporation, or association in a foreign country.

(f) MODIFICATION OF CHANGES IN DUTY.—Any increased or decreased rate of duty or change in classification or in basis of value which has taken effect as above provided may be modified or terminated in the same manner and subject to the the same conditions and limitations (including time of taking effect) as is provided in this section in the case of original increases, decreases, or changes.

(g) PROHIBITION AGAINST TRANSFERS FROM THE FREE LIST TO THE DUTIABLE LIST OR FROM THE DUTIABLE LIST TO THE FREE LIST.—Nothing in this section shall be construed to authorize a transfer of an article from the dutiable list to the free list or from the free list to the dutiable list, nor a change in form of duty. Whenever it is provided in any paragraph of Title I of this Act, or in any amendatory Act, that the duty or duties shall not exceed a specified ad valorem rate upon the articles provided for in such paragraph, no rate determined under the provisions of this section upon such articles shall exceed the maximum so specified.

(h) DEFINITIONS.—For the purpose of this section—

(1) The term "domestic article" means an article wholly or in part the growth or product of the United States; and the term "foreign article" means an article wholly or in part the growth or product of a foreign country.

(2) The term "United States" includes the several States and Territories and the District of Columbia.

(3) The term "foreign country" means any empire, country, dominion, colony, or protectorate, or any subdivision or subdivisions thereof (other than the United States and its possessions).

(4) The term "cost of production", when applied with respect to either a domestic article or a foreign article, includes, for a period which is representative of conditions in production of the article: (A) The price or cost of materials, labor costs, and other direct charges incurred in the production of the article and in the processes or methods employed in its production; (B) the usual general expenses, including charges for depreciation or depletion which are representative of the equipment and property employed in the production of the article and charges for rent or interest which are representative of the cost of obtaining capital or instruments of production; and (C) the cost of containers and coverings of whatever nature, and other costs, charges, and expenses incident to placing the article in condition packed ready for delivery.

(i) RULES AND REGULATIONS OF PRESIDENT.—The President is authorized to make all needful rules and regulations for carrying out his functions under the provisions of this section.

(j) RULES AND REGULATIONS OF SECRETARY OF TREASURY.—The Secretary of the Treasury is authorized to make such rules and regulations as he may deem necessary for the entry and declaration of foreign articles of the class or kind of articles with respect to which a change in basis of value has been made under the provisions of subdivision (b) of this section, and for the form of invoice required at time of entry.

(k) INVESTIGATIONS PRIOR TO ENACTMENT OF ACT.—All uncompleted investigations instituted prior to the approval of this Act under the provisions of section 315 of the Tariff Act of 1922, including investigations in which the President has not proclaimed changes in classification or in basis of value or increases or decreases in rates of duty, shall be dismissed without prejudice; but the information and evidence secured by the commission in any such investigation may be given due consideration in any investigation instituted under the provisions of this section.

It appears from collective exhibit 1 that due notice of the investigation was given by the United States Tariff Commission. The title page of exhibit 2, the report of the United States Tariff Commission, reads: "Report to the President on the differences in costs of production of fish packed in oil, in the United States and in the principal competing countries, as ascertained pursuant to the provisions of Section 336 of Title III of the Tariff Act of 1930."

The pertinent portion of the Commission's letter of transmittal reads as follows:

UNITED STATES TARIFF COMMISSION,

*Washington, December 4, 1933.*

My dear Mr. President: I have the honor to transmit herewith the report of an investigation made by the United States Tariff Commission of differences in costs of production in the United States and in the principal competing country, for the purposes of section 336 of title III of the Tariff Act of 1930, of fish packed in oil.

This report is accompanied by a summary of information obtained by the Commission in the investigation.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Respectfully,

ROBERT L. O'BRIEN,
*Chairman.*

The President,
*The White House.*

In this report the Tariff Commission, among other things, states as follows:

The principal classes of fish packed in oil, both in domestic consumption and in imports, are tuna and sardines. Separate cost investigations were made by the Commission of these two classes. \* \* \*.

\*　　\*　　\*　　\*　　\*　　\*　　\*

## FINDINGS OF THE COMMISSION

TUNA PACKED IN OIL.

1. The packing of tuna in the United States is confined to California (about 95 percent of the total), and Hawaii. The production in California \* \* \* from 1928 to 1930 about 36,000,000 pounds, reaching a peak of 45,000,000 pounds in 1930. In each of the years 1931 and 1932 it was in the neighborhood of 28,000,-000 pounds.

2. Imports of tuna packed in oil were not reported separately prior to 1931 but were up to that time insignificant. In 1931 they amounted to 937,000 pounds and in 1932 to 5,945,000 pounds, being equal in the latter year to about 22 percent of domestic production. The imports are principally from Japan, with a small quantity from Mexico. The industry of packing tuna is a new one in both of these countries.

3. Tuna packed in oil consists of four species: Albacore, yellowfin, bluefin, and striped. Albacore was formerly caught in large quantities by United States fishermen off the coasts of the United States and of Mexico but is now rare in those waters, and the supply used by domestic packers has for some years been mostly imported, in frozen form, from Japan. The other species are caught by United States vessels in the waters above mentioned, chiefly off the cost of Mexico. At present about half of the domestic production of tuna packed in oil consists of yellowfin, about one fourth of striped, and about one sixth of albacore.

4. Japan is the principal competing country for tuna packed in oil. The bulk of imports from that country is albacore. There are also small imports of tuna packed in oil from Mexico and other countries.

5. The year 1932 has been taken as the representative period in this investigation for the purposes of section 336. This is the only complete year during which there have been substantial imports. Costs of production in the United States during the months of June, July, and August, 1932, are representative of costs of production for the year 1932, and costs of production in Japan during the 9 months ended August 31, 1932, are representative of costs of production in Japan for the year 1932. * * *

6. Japanese tuna packed in oil is like or similar to tuna packed in oil produced in the United States. The difference in costs between albacore packed in Japan and albacore and chunk or fancy yellowfin packed in the United States has been taken as representative of the difference in costs with respect to all tuna packed in oil. These two classes predominate in the trade.

    *        *        *        *        *        *        *

8. In accordance with section 336 (e) (2) (A), the Commission accepted the weighted average of invoice prices of tuna imported from Japan as evidence of costs of production in the principal competing country. In view of information developed at the public hearing and during the course of the investigation the Commission was of the opinion that the expenditure of public funds in the conduct of an investigation in Japan would not be warranted by reason of the uncertainty of the cost records resulting from the newness of the industry and from other causes.

9. * * *. The domestic cost of tuna fish packed in oil, computed on the basis of prices paid by packers for raw fish during the representative period was, including costs of transportation and other delivery charges to the principal market in the United States, $5.08 per case. The foreign cost of production (as evidenced by invoice prices of imports) of tuna fish packed in oil, including costs of transportation and other delivery charges to the principal market in the United States, converted to dollars at the exchange rates at the time of the several shipments, was $3.55 per case.

    *        *        *        *        *        *        *

## CONCLUSION

The Commission finds it shown by the investigation (a) that the duty of 30 per centum ad valorem, expressly fixed by statute on tuna fish, prepared or preserved in any manner, when packed in oil or in oil and other substances, does not equalize the difference in the costs as ascertained * * * of the domestic article and the like or similar foreign article produced in the principal competing country; (b) that in order to equalize this difference it is necessary to increase the duty by 15 per centum ad valorem; and (c) that the duty necessary to equalize this difference is 45 percentum ad valorem.

Counsel for the plaintiffs in his brief filed herein quotes from the dissenting opinion of Commissioner Page, which, in our opinion, simply corroborates the findings of the majority of the Commissioners.

In our opinion, the fact that there were four different kinds of tuna fish is not relevant to the issue herein. They were all tuna fish just as in the recent case of *Union Fork & Hoe Co.* v. *United States*, 24

C. C. P. A. 199, T. D. 48656, there were various kinds of forks. In that case the appellate court said:

It is also contended that the domestic products which were the measure of the differences of costs of production were not like or similar to the imported products. * * * However, the report shows that the commission investigated "all types of forks," and that the samples which it selected were typical of all such goods. * * * It thus appears that even though it may be said that the samples which were before the commission and were selected by it, did not embrace samples of all of the imported goods, they were typical and fairly represented the cost of production.

In its report herein the United States Tariff Commission found that Japanese tuna fish packed in oil is like or similar to tuna fish packed in oil produced in the United States, and that the differences between costs of production of albacore packed in oil in Japan and albacore, chunk or fancy or yellowfin packed in oil in the United States were representative of the differences in costs of production of all tuna fish packed in oil.

In our opinion, the United States Tariff Commission fully complied with the provisions of the statute. However, if there were any weight to the contentions made by counsel for the plaintiffs in his brief, as a matter of law the plaintiffs could not recover as the findings of fact by the commission are final.

In the recent case of *United States* v. *George S. Bush & Co., Inc.*, 310 U. S. 371, the Supreme Court of the United States had before it the question of the legality of the Presidential Proclamation increasing the duty on certain Japanese clams. Counsel for the importer contended that the conversion by the commission from yen into dollars for the year 1932 was illegal, because by its action the commission obtained a value which did not represent the cost of production referred to in the statute, namely, the cost for the selected "representative period." In other words, the contention was that the commission had used an illegal currency conversion factor in determining the cost of production. In reversing the decision of our appellate court (in *George S. Bush & Co., Inc.*, v. *United States*, 27 C. C. P. A. 64, C. A. D. 64) the United States Supreme Court, in its last hereinabove-cited decision said:

The powers which Congress has entrusted to the President under the Act of 1930 do not essentially differ in kind from those which have been granted him under the tariff acts for well over a century. See *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 308 *et seq.*, for a review of the statutes. *Since its creation in 1916 the Commission has acted as an adviser to the Congress or to the President.* Under § 336 of the Act of 1930 the Commission serves the President in that role. It does not increase or decrease the rates of duty; it is but the expert body which investigates and submits the facts and its recommendations to the President. It is the judgment of the President on those facts which is determinative of whether or not the recommended rates will be promulgated. In substance and to a great extent in form (*Norwegian Nitrogen Products Co.* v.

*United States, supra*) the action of the Commission and the President is but one stage of the legislative process. *Hampton & Co.* v. *United States*, 276 U. S. 394. "No one has a legal right to the maintenance of an existing rate or duty." *Norwegian Nitrogen Products Co.* v. *United States, supra*, p. 318. And the judgment of the President that on the facts, adduced in pursuance of the procedure prescribed by Congress, a change of rate is necessary is no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment. It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review. *Martin* v. *Mott*, 12 Wheat. 19; *Monongahela Bridge Co.* v. *United States*, 216 U. S. 177; *Dakota Central Telephone Co.* v. *South Dakota*, 250 U. S. 163; *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1. As stated by Mr. Justice Story in *Martin* v. *Mott, supra*, pp. 31–32; "Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts."

*For the judiciary to prove the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains.* Under the Constitution it is exclusively for Congress, or those to whom it delegates authority, to determine what tariffs shall be imposed. Here the President acted in full conformity with the statute. *No question of law is raised when the exercise of his discretion is challenged.* [Italics ours.]

In the case of *Union Fork & Hoe Co.* v. *United States*, T. D. 47478, 67 Treas. Dec. 82, counsel for the plaintiff contended—

1. That the foreign cost of production of said merchandise was not obtained by the United States Tariff Commission from the German manufacturer who exported the articles in controversy to the United States

2. That the United States Tariff Commission failed to obtain the weighted average of the invoice prices or values for a representative period. \* \* \*

3. That the Tariff Commission found the cost of production of wholly different kinds of forks than those manufactured in the United States.

In support of its contentions counsel quoted at length from the decision in *Feltex Corp. (United States Impleaded)* v. *Dutchess Hat Works*, 21 C. C. P. A. 463, T. D. 46957. In commenting upon the applicability of said quotations, in the last-cited case of *Union Fork & Hoe Co.* v. *United States, supra*, we said:

We must confess that we find nothing in the above quotations which would tend to sustain the contention of the plaintiff. Much more pertinent, in our opinion, is the following excerpt from said decision (p. 476):

It will be observed that the commission is required only to report to the President "the results of the investigation", and "its findings", and shall specify in its report such increases or decreases in rates of duty, including any changes in classification, as it finds shown by the investigation to be necessary to equalize differences in costs of production. *It is not required to include in its report the evidence taken, nor is it required to include in its report any statement of the evidence or facts before the commission, secured in its investigation.* (Italics ours.)

We also said in that decision:

We are convinced that it is not within the province of this court to inquire into the reasons which the Commission may regard as rendering the ascertainment and consideration of certain information impracticable.

In our opinion it is well-settled law that neither this nor any other court may pass judgment upon the facts found by the United States Tariff Commission acting under authority of section 336 of the Tariff Act of 1930, any more than it may pass judgment on facts found by a committee of the Congress, for, as stated by the Supreme Court in *George S. Bush & Co., Inc.* v. *United States, supra,* "the action of the Commission and the President is but one stage of the legislative process. * * * For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains."

Upon the entire record we hold as a matter of law that the merchandise in question is properly dutiable at the rate of 45 per centum ad valorem under the provision in paragraph 718 (a) of the Tariff Act of 1930 for "Fish, prepared or preserved in any manner, when packed in oil or in oil and other substances" (that rate having been increased from 30 per centum ad valorem by Presidential proclamation promulgated in T. D. 46795, 64 Treas. Dec. 708), as classified by the collector. All claims of the plaintiffs are therefore overruled and judgment will be rendered accordingly.