**CHAMBER OF COMMERCE of the United States of America, et al., Plaintiffs,**

v.

**Robert B. REICH, Secretary, U.S. Department of Labor, Defendant.**

**Civ.A. No. 95–0503.**

United States District Court, District of Columbia.

July 31, 1995.

Timothy Belcher Dyk, Jones, Day, Reavis & Pogue, Washington, DC, for plaintiffs.

Margaret Susan Hewing, U.S. Department of Justice, Civil Division, Washington, DC, Sandra Marguerite Schraibman, U.S. Department of Justice, Federal Programs Branch, Washington, DC, for defendants.

Frank Myers Northam, Webster, Chamberlain & Bean, Washington, DC, for National Right to Work Committee, Inc.

## AMENDED MEMORANDUM–OPINION[1]

KESSLER, District Judge.

This case presents a challenge to the authority of the President of the United States to issue an Executive Order, pursuant to the Federal Property and Administrative Services Act ("FPASA"), 40 U.S.C. § 471, *et seq.*, authorizing the Secretary of Labor to disqualify employers, with federal contracts exceeding $100,000, who hire permanent replacement workers during a lawful economic strike.

This Court originally held that the case, in the posture then presented, was not ripe for judicial review and dismissed Plaintiffs' requests for declaratory and injunctive relief. *Chamber of Commerce v. Reich,* 886 F.Supp. 66 (D.D.C.1995). On appeal, the Court of Appeals held, because the implementing regulations had become final and both the "fitness and hardship prongs" of *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) had been satisfied, that the case was ripe for judicial review and remanded it for expedited consideration. *Chamber of Commerce v. Reich,* 57 F.3d 1099 (D.C.Cir.1995) (per curiam).

On remand, this Court now concludes that judicial review is precluded under *Dalton v. Specter,* —— U.S. ——, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994). Despite that conclusion, the Court has determined, for the following reasons, that the public interest and the interest of the litigants will be best served by reaching the merits of all the legal issues presented: the full implications of the *Dalton* opinion are decidedly unclear at this point,[2] and it is not unlikely that either the Court of Appeals or the Supreme Court (where all parties acknowledge that this case is heading) may, upon reflection, reach a conclusion that differs from this Court's; the parties raise important issues regarding the extent of Presidential power and the scope of national labor relations policy; and judicial economy and efficiency dictate that all of these difficult questions be resolved as expeditiously as possible in one unitary proceeding rather than in a piecemeal fashion.

On the merits of the issues presented, the Court concludes, first, that the Executive Order is authorized under the FPASA, and demonstrates a sufficiently close nexus between the statutory goals of economy and efficiency in government procurement and the specific provisions of the Order.

Second, the Court concludes that the Executive Order applies to activities in which the government is engaging in its proprietary capacity as a purchaser of goods and services, not to activities of a regulatory or policy-making nature. Consequently, the preemption doctrines enunciated by the Supreme Court under the Labor Management Relations Act ("LMRA") and the National Labor Relations Act ("NLRA"), 29 U.S.C. § 141 *et seq.,*[3] are not applicable. Therefore, the government is free to insist, as a condition of its entering into federal contracts, that employers not hire permanent replacements for economic strikers even though such a condition would, in the private collective bargaining sector, fall into the "free zone from which all regulation, 'whether federal or State,' is excluded," *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 111, 110 S.Ct. 444, 451, 107 L.Ed.2d 420 (1989).

█ Finally, the Court concludes, after balancing all the relevant factors, that an injunction pending appeal is warranted because the irreparable injury claimed by Plaintiffs from not granting such a stay will far outweigh any loss to be suffered by the government or the public by granting it.

---

1. This opinion is amended only for purposes of correcting some misspellings which came to the Court's attention.

2. The Court could find only one case in which *Dalton* has been cited since its issuance. That case, *Public Citizen v. Kantor,* 864 F.Supp. 208 (D.D.C.1994), did not contain any extended discussion of *Dalton's* reasoning.

3. The LMRA includes, primarily, the provisions of the NLRA as originally enacted in 1935 and subsequent amendments to the NLRA enacted in the Taft–Hartley Act of 1947.

## I. *Statement of Facts* [4]

On March 8, 1995, President William J. Clinton issued Executive Order 12954, 60 Fed.Reg. 13023 (1995) ("Executive Order" or "Order"). The Order's stated purpose is "to ensure the economical and efficient administration and completion of Federal Government contracts." *Id.* at 13023. The Order states that "[i]t is the policy of the executive branch in procuring goods and services that ... contracting agencies shall not contract with employers that permanently replace lawfully striking employees." *Id.* The Order applies to government contracts in excess of $100,000. On May 25, 1995, the Secretary of Labor, who is charged with implementing the Order, issued final regulations. *See Permanent Replacement of Lawfully Striking Employees by Federal Contractors,* 60 Fed. Reg. 27,856 (May 25, 1995) (to be codified at 29 C.F.R. ch. II & pt. 270) (effective date June 26, 1995).

On March 15, 1995, Plaintiffs, Chamber of Commerce of the United States of America, American Trucking Associations, Inc., Labor Policy Association, National Association of Manufacturers and Bridgestone/Firestone, Inc. filed suit for declaratory and injunctive relief seeking to immediately enjoin implementation of the Order and to declare it unlawful. On May 9, 1995, this Court granted the government's Motion to Dismiss, and dismissed the complaint on grounds of prematurity. On June 21, 1995, the Court of Appeals reversed and remanded the case for a decision on the merits. At this juncture, the parties' cross-motions for summary judgment are once again before the Court.

## II. *Judicial Review Is Precluded under Dalton v. Specter*

■ In *Dalton v. Specter,* — U.S. —, —, 114 S.Ct. 1719, 1728, 128 L.Ed.2d 497

(1994), Chief Justice Rehnquist, writing for a unanimous Court,[5] ruled that the plaintiff's claim that the President exceeded his authority under the Defense Base Closure and Realignment Act of 1990, 10 U.S.C. § 2687 (1988 Ed., Supp. IV), "is not a constitutional claim, but a statutory one." — U.S. at —, 114 S.Ct. at 1728. In examining such a statutory claim, the Court held that where a statute such as the 1990 Defense Base Closure Act "commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Id.* Finally, while acknowledging that courts may review claims that a President acted unconstitutionally, *Dalton* emphasized that "simply alleging that the President has exceeded his statutory authority" does not turn statutory claims into constitutional ones subject to judicial review. — U.S. at —, 114 S.Ct. at 1726.

This case fits squarely within the parameters of *Dalton.* Plaintiffs are asserting that the Executive Order is unconstitutional because it violates the doctrine of separation of powers. However, Plaintiffs' separation of powers claim is based on the perceived conflict between the Executive Order and various provisions of the NLRA and the LMRA. In reality, what Plaintiffs seek to paint as their "constitutional" claim, in order to obtain judicial review under *Dalton,* is simply a claim that the provisions of the Executive Order violate other existing statutes. In short, it is a claim that the President abused or exceeded his statutory powers.

That is precisely the rationale explicitly rejected by the Supreme Court when it reversed the Third Circuit in *Dalton.* That Court of Appeals had "reasoned, ... that whenever the President acts in excess of his statutory authority, he also violated the constitutional separation of powers doctrine." — U.S. at —, 114 S.Ct. at 1725.

---

**4.** Both Plaintiffs and Defendants filed Statements of Material Fact pursuant to Local Rule 108(h). The Court treats all facts that were not disputed as conceded. *Id.*

The Court is entitled to consider affidavits, depositions, exhibits, court judgments and orders, letters, transcripts of prior court proceedings, matters of public record and other materials outside the pleadings in considering a motion under Federal Rule of Civil Procedure 12(b). *See*

**5A** C. Wright & A. Miller, *Federal Practice and Procedure,* (2d Ed.1990 and 1994 supp.) § 1364, at 475—481, and nn. 25–44.

**5.** Although all Justices agreed on the results, Justice Blackmun filed a partial concurrence and Justice Souter filed a partial concurrence on behalf of Justices Blackmun, Stevens, and Ginsburg.

Concluding that this analysis relied upon by the Third Circuit "is flawed", the Supreme Court explained that

> [o]ur cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution. On the contrary, we have often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority. —— U.S. at ——, 114 S.Ct. at 1726.

Applying the Court's reasoning to this case, the same conclusion must be reached: namely that the claim being asserted is a statutory one, and not a constitutional one.

In an effort to avoid the consequences of this reasoning, Plaintiffs try to differentiate between situations in which the actions of the President, taken pursuant to statutory authority, are inconsistent with provisions of the statute upon which he is relying and situations in which his actions, taken pursuant to statutory authority, are inconsistent with provisions of statutes other than the one upon which he is relying for his authority. The distinction is an illusory one, however, since in either case it is statutes—not Constitutional provisions—which are defining and confining the President's authority to act.

While *Dalton* reaffirms the holding in *Franklin v. Massachusetts,* 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), that presidential decisions are reviewable for claims genuinely raising constitutional issues, i.e., that the President violated a specific Constitutional right or relied solely on the Constitution for asserting his authority, that holding does not advance Plaintiffs' position. In reaffirming this principle, the Court cites as

an example, *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587, 72 S.Ct. 863, 866, 96 L.Ed. 1153 (1952), where the "only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander–in–Chief of the Armed Forces." —— U.S. at ——, 114 S.Ct. at 1726. In the instant case, neither Plaintiffs nor Defendant are claiming Presidential reliance on inherent constitutional authority as justification for issuance of Executive Order 12954. It is perfectly clear that the only authority being asserted by the President to support issuance of the Executive Order is the FPASA—i.e., a statutory basis.

When we turn to the Supreme Court's analysis of claims that the President has violated a statutory mandate, we see that "such review is not available when the statute in question commits the decision to the discretion of the President." *Id.*[6] That is exactly what the FPASA does. It sets forth a general goal of achieving an "economical and efficient system for ... procurement and supply." 40 U.S.C. § 471. Within the broad limits of furthering economy and efficiency, the President "may prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act." 40 U.S.C. § 471.

This is precisely the kind of broad discretionary authority given to the President by the 1990 Defense Base Closure Act at issue in *Dalton* and by the joint Congressional resolution at issue in *Dakota Central Telephone Co. v. South Dakota ex rel. Payne,* 250 U.S. 163, 184, 39 S.Ct. 507, 63 L.Ed. 910 (1919), the case relied upon so heavily by Chief Justice Rehnquist in his *Dalton* opinion.[7]

---

**6.** *Dalton* does "assume for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA." —— U.S. at ——, 114 S.Ct. at 1727. However, after making this assumption, Chief Justice Rehnquist then immediately cautions that "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President." *Id.* Moreover, the case cited in that passage, *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), concerned whether statutory authori-

ty existed to justify the Presidential suspension of claims of United States nationals against Iran. Unlike that case, there is no disagreement amongst the parties in the instant case that the FPASA is the source of the President's authority to issue Executive Order 12954.

**7.** Under the joint resolution at issue in *Dakota Central,* H.J.Res. 309, 65th Cong., 2d Sess., 40 Stat. 904 (1918), Congress empowered the President to supervise or obtain control of communications systems "whenever he shall deem it necessary for the national security or defense." The

Plaintiffs try to distinguish *Dalton* by arguing that it only applies to bar review of statutory claims where the statute itself precludes such review. The simple answer is that there was no explicit provision in the 1990 Defense Base Closure Act which precluded judicial review, and therefore it cannot be said that the Court's rationale rested on that premise. The Court reasoned that Congress "foreclosed" judicial review by committing the decisions of the President to his broad discretion not by enacting a specific statutory section barring judicial review.[8] — U.S. at ——, 114 S.Ct. at 1727.

■ Finally, Plaintiffs do not strongly press their argument that the President's authority to issue the Executive Order is reviewable under the Administrative Procedure Act, ("APA"), 5 U.S.C. § 701 *et seq.* It is a fundamental principle of administrative law that the APA provides a statutory basis for judicial review of actions taken by federal agencies. However, as *Franklin v. Massachusetts* held, 505 U.S. at ——, 112 S.Ct. at 2773, and *Dalton* reaffirmed, —— U.S. at ——, 114 S.Ct. at 1723, "the APA does not apply to the President." Even though Plaintiffs have chosen to sue Secretary Reich as

Defendant, it is clear that their real challenge is to the President's authority to issue the Executive Order, not to Secretary Reich's implementation of it.

■ For all of the reasons stated, the Court concludes that the holding and underlying rationale of *Dalton v. Specter* compel the conclusion that there is no judicial review of the President's issuance of Executive Order 12954. Despite having reached that conclusion the Court is taking the unusual step of proceeding to decide the remaining legal issues raised by the parties.

As indicated earlier the full implications of *Dalton* are decidedly unclear and there has been no appellate application of its principles since it was decided less than a year ago. Even the Supreme Court, at the end of its opinion, acknowledged the fears of the litigants "that failure to allow judicial review here would virtually repudiate *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), and nearly two centuries of constitutional adjudication." —— U.S. at ——, 114 S.Ct. at 1728. Plaintiffs in the instant case have voiced similar grave concerns, many of which this Court shares.[9] In sum, it may

---

plaintiffs asserted that the facts necessary to justify the President's exercise of this power did not exist. *Id.* at 184, 39 S.Ct. at 509. The Court rejected the claim, stating that the plaintiffs were asking the Court to review a "mere excess or abuse of discretion in exerting a power given," not "a want of power." *Id.* Refusing to review whether the President's acts were "necessary for the national security or defense," the Court held that such a claim "involves considerations which are beyond the reach of judicial power." *Id.*

8. It is true that Justice Souter's concurrence states that "the text, structure, and purpose of the Act compel the conclusion that judicial review of the Commission's or the Secretary's compliance with it is precluded." —— U.S. at ——, 114 S.Ct. at 1729. However, none of his many statutory citations refer to any specific foreclosure of judicial review. Rather, they refer to "a series of tight and rigid deadlines ... for decision and implementation" of the timetable set forth in the Act. —— U.S. at ——, ——, 114 S.Ct. at 1729, 1730.

9. See, for example, *The Supreme Court, 1993 Term—Foreward: Leading Cases,* 108 Harv. L.Rev. 139, 300–310 (1994), in which the writer noted that "[t]he precise import of this decision, which the Court announced in an almost offhanded way ... is not clear. The distinction

upon which the Court relies—a distinction between actions in excess of statutory authority and actions altogether lacking statutory authority—is precisely the sort of formalism that dissolves upon close inspection. Nor is it clear how the distinction might be tightened to provide guidance to the lower courts—," 108 Harv.L.Rev. at 300–301. The writer goes on to note that "[t]he unfortunate result of this unreflective line-drawing is to cast into doubt the whole notion of constitutional restraints on executive power." *Id.* at 305.

Echoing the words of the opinion itself, the writer states that "if, as seems likely, the Court did not intend to set aside centuries of jurisprudence, some further principle must define the bounds of acceptable executive action pursuant to statutes." *Id.* at 308. The writer concludes by saying that the "Court's distinction [between action in excess of statutory authority and action without statutory authority] thus lacks both precision and rationale ... However, coupled with the Court's well-established doctrine that executive action is not reviewable for abuse of discretion, the effect will often be, as in the instant case, to place executive action beyond review. It is unfortunate that the Supreme Court, in a unanimous decision that betrays not even a passing acquaintance with the difficulties its decision raised, placed its imprimatur on a constitutional

well be that, upon reflection, there will be either a narrowing or a fuller explication of *Dalton* by the Court of Appeals or the Supreme Court itself which will necessitate a change of outcome on the issue of judicial review.

Given that possibility, given the significance of the legal issues raised regarding the extent of Presidential power under the FPASA and its relationship to our national labor relations laws, and given the desire to reduce the delay and costs of this litigation to all concerned, the Court has concluded that it will serve both the public interest and the interest of the litigants to now turn to the merits of the legal issues.

### III. *Executive Order 12954 Is Authorized Under the FPASA*

██ The Federal Property and Administrative Services Act, 40 U.S.C. § 471 *et seq.*, enacted in 1949 in response to the recommendations of the Hoover Commission, "was designed to centralize Government property management and to introduce into the public procurement process the same flexibility that characterizes such transactions in the private sector." *AFL–CIO v. Kahn*, 618 F.2d 784, 787 (D.C.Cir.1979) (en banc), *cert. denied* 443 U.S. 915, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1979).

In order to effectuate the Congressional policy set forth in Section 471 "to provide for the Government an economical and efficient system" of procurement and property management, the President is authorized in Section 486(a) to "prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act."[10] The *Kahn* court found that "by emphasizing the leadership role of the President in setting Government-wide procurement policy on matters common to all agencies, Congress intended that the President play a direct and active part in supervising the Government's management functions." *Id.* at 788.

Construing this broad statutory language, the legislative history of the Act, and executive branch practice since its enactment, the Court of Appeals for our Circuit concluded that any executive order based on Section 486(a) "must accord with values of 'economy' and 'efficiency'." *Id.* at 792. Although recognizing that the definition of presidential authority to be exercised under Section 486(a) is "imprecise", the Circuit Court noted that the governing values of "economy" and "efficiency" are not narrow and that "they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions." *Id.* at 789.

In determining whether a presidential directive—in this case, the Executive Order—is consistent with the statutory goals of economy and efficiency, "the President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting congressional reversal, it is 'entitled to great respect.' [citations omitted]." *Id.*

This deference to the President's interpretation of his own statutory authority, so long as it is reasonable and not inconsistent with the plain language of the statute, is analogous to the deference accorded to an agen-

distinction that cuts so close to the heart of the constitutional principle of separation of powers." *Id.* at 309–310.

While these comments may well embody a certain youthful hyperbole, nonetheless, the underlying dangers are very real.

**10.** The range of government activities covered by the Congressional declaration of policy contained in Section 471 is extraordinarily broad. It is this range of activities which the President is mandated to provide "policies and directives" for in Section 486(a). Thus, Section 471 covers: (a) the procurement and supply of personal property and nonpersonal services, including related functions such as contracting, inspec-tion, storage, issue, specifications, property identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before Federal and State regulatory bodies; (b) the utilization of available property; (c) the disposal of surplus property; and (d) records management.

cy's interpretation of the statute it is charged with administering. *See Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

Under the *Chevron* doctrine, if a statute is silent or ambiguous with respect to a particular issue, a reviewing court asks only whether the agency's response is a "permissible construction" of the statute. *Id.* at 843, 104 S.Ct. at 2782. That construction is entitled to "considerable weight" by the reviewing court, *id.* at 844, 104 S.Ct. at 2782, and will be upheld so long as it is "rational and consistent" with the statute. *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990).

Surely, as *Kahn* suggests, the President is entitled to no less institutional deference than the administrative agencies he oversees. Moreover, the "imprecise definition of presidential authority", as well as the "direct and broad ranging authority" granted to the President by the FPASA "in order to achieve a flexible management system capable of making sophisticated judgments in pursuit of economy and efficiency", *Kahn,* 618 F.2d at 789, combine to make deference to the President's construction of the statute's mandate particularly appropriate.[11]

Over the years, the courts and in particular this Circuit have consistently upheld the broad interpretation given to the FPASA by Presidents charged with its administration, especially in light of the absence of any Congressional response to the exercise of that statutory authority. Presidents have relied on their authority under the FPASA to issue a number of Executive Orders and policy directives which directly affect the relationship between government contractors and their employees.

Thus, in *Contractors Assn. v. Secretary of Labor,* 442 F.2d 159, 171 (3d Cir.), *cert. denied* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), the Court of Appeals for the Third Circuit rejected a challenge to the President's authority under the FPASA to issue an Executive Order requiring bidders on federally-assisted construction projects to submit an affirmative action plan.[12] The Court reasoned that the government had an interest in assuring that suppliers did not, in the long run, increase costs and decrease the timeliness of delivery of goods by refusing or failing to hire available minority workers. *Id.* at 170. Rejecting the argument that the President was engaging in "social legislation" under the guise of procurement management, the Third Circuit noted that since the affirmative action order covered only contractors on federally-assisted construction projects, the President "acted in the one area in which discrimination in employment was most likely to affect the cost and progress of projects in which the federal government had both financial and completion interests." *Id.*

---

11. The flexibility given to the President is highlighted when we compare it with the statutory constraints placed by the FPASA on the authority of the Administrator of General Services (the "Administrator") and the heads of the different federal agencies. *See e.g.* 40 U.S.C. § 481(c) (specifying conditions under which regulations promulgated by the Administrator may authorize acquisitions of personal property); *id.* § 481(e) (specifying conditions under which heads of executive agencies may exchange or transfer excess medical materials or supplies and imposing limits on regulations promulgated by the Administrator); *id.* § 483(a) (requiring Administrator to prescribe policies and methods to promote the maximum utilization of excess property and requiring the Administrator to make determinations of fair value and appropriate price for transfer of excess property between agencies). In contrast, the statute places no similar constraints on the broad grant of power given the President in Section 486(a).

12. Prior to successfully defending this legal challenge, different Presidents had issued—without challenge—a number of executive orders relating to this subject. It was not until 1964, when President Lyndon Johnson directed by Executive Order that federal contractors not discriminate on the basis of age, Executive Order 11141, 3 C.F.R. 179 (1964–65 Compilation), reprinted in 5 U.S.C. § 3301 note (1976), that a legal challenge was brought to test this reliance on the authority of the FPASA. *See Farmer v. Philadelphia Electric Co.,* 329 F.2d 3 (3d Cir.1964), where the court held that these orders were a proper exercise of presidential authority under the FPASA as well as the Defense Production Act of 1950, and that an employee alleging racial discrimination in work assignments had no private right of action.

For a listing of the Executive Orders dealing with anti-discrimination requirements for government contractors, see *Kahn,* 618 F.2d at 790, nn. 32 and 33.

Subsequently, this Circuit issued two major decisions upholding the President's statutory authority under FPASA. In *Kahn, supra*, the Court of Appeals upheld Executive Order 12092, issued by President Jimmy Carter, requiring that government contractors accept price and wage controls. In *American Fed'n of Gov't Employees v. Carmen*, 669 F.2d 815 (D.C.Cir.1981), an Executive Order requiring federal employees to give up their free parking privileges was sustained as being sufficiently related to government efficiency and economy.

Relying upon the authority of the FPASA, President Nixon banned employment of certain state prisoners in all federal contract work. Executive Order 11755, 3 C.F.R. 837 (1973). Recently, President George Bush issued Executive Orders 12800 and 12818. Executive Order 12800 required federal contractors to post notices advising employees of their right not to join or maintain membership in a union. Executive Order 12800, 57 Fed.Reg. 12985 (1992). Executive Order 12818 prohibited government contractors from entering into pre-hire agreements in the construction industry. Executive Order 12818, 57 Fed.Reg. 48713 (1992).[13]

Executive Order 12818, which never faced a legal challenge, poses a situation that is a direct analogue of the one presently before the Court. That Executive Order required, as a condition of securing contracts with the federal government, that contractors agree to refrain from engaging in certain business conduct, i.e. entering pre-hire agreements, which is legal and permissible under the National Labor Relations Act, just as here Executive Order 12954 requires, as a condition of securing contracts with the federal government, that contractors agree to refrain from engaging in certain business conduct, i.e., hiring permanent replacements for economic strikers, which is also legal and permissible under the National Labor Relations Act.

In determining whether the President has acted in conformity with his authority under the FPASA, the Court of Appeals for this Circuit has asked only whether there is a reasonable nexus between his actions and the pursuit of economy and efficiency in the management of federal property. *Kahn*, 618 F.2d at 793. Emphasizing that the President was not being given "a blank check ... to fill in at his will", *Kahn* noted the breadth of the FPASA requirement that the President "make procurement policy decisions based on considerations of economy and efficiency." *Id.* Despite that breadth, the Court concluded that "this standard can be applied generally to the President's actions to determine whether those actions are within the legislative delegation." *Id.* at 793 n. 51.

Moreover, *Kahn* demonstrates that the Court of Appeals does not review a presidential directive for the business acumen of the President's economic judgment; rather the Court will uphold such a directive so long as it is reasonably related to economic considerations. The lower court in *Kahn*, reviewing the Executive Order imposing wage and price controls on federal contractors, expressed concern that the Order would increase the government's procurement costs rather than promote economy. It speculated that the defendant's proposed nexus between price and wage controls and the economy and efficiency goals of the FPASA "ignores another possible result, namely, that the government, in the name of 'economy' will be forced to pass over the low bidder in order to do business with an adherent to the wage guidelines." *AFL–CIO v. Kahn*, 472 F.Supp. 88, 95 (D.D.C.1979). The Court of Appeals dismissed the District Court's worries: "we find no basis for rejecting the President's conclusion that any higher costs incurred in those transactions will be more than offset by the advantages gained" under a system of wage controls. *Kahn*, 618 F.2d at 793. Significantly, the court refused to require proof that presidential directives issued pursuant to the FPASA would produce advantageous economic results for the government. Because it found a "reasonable nexus" between the Order and the price and wage controls, the Court of Appeals concluded that the President had acted within his broad statutory powers. *Id.*

---

**13.** Executive Order 12800 and Executive Order 12818 were rescinded by President Clinton on February 1, 1993. Executive Order 12836, 58 Fed.Reg. 7085 (1993).

In this case, Plaintiffs argue that the Executive Order's findings fail to establish a sufficient nexus between the withdrawal of business from contractors who hire permanent striker replacements during economic strikes and the FPASA's goals of economy and efficiency. While the findings contained in the Executive Order are less than expansive, this Court concludes that they are "in accord with the 'economy and efficiency' touchstone of the FPASA", *id.*, required by *Kahn.*

Fundamentally, Executive Order 12954 reflects the President's judgment that there is a negative relationship between satisfaction of the government's procurement needs and the use of permanent striker replacements by government contractors. As noted earlier, it declares that

> "[i]t is the policy of the executive branch in procuring goods and services that . . . contracting agencies shall not contract with employers that permanently replace lawfully striking employees." 60 Fed.Reg. 13023 (1995).

The Order authorizes the Secretary of Labor to terminate the existing contracts of such employers and to disqualify such employers from competing for future government contracts. *Id.* at 13023–24 (§§ 3 & 4).

The Order states that government contractors' prolonged labor disputes and unstable labor relations adversely affect the Federal Government's operations. In addition, the Order notes that strikes involving permanent striker replacements are longer in duration than other strikes, that the use of permanent striker replacements undermines cooperative labor relations, and that the permanent replacement of an existing workforce reduces the effectiveness of an employer. The Order explains that the Government, in order to ensure timely delivery of goods and quality services, must assist federal contractors in attaining the balance of employer and worker rights most conducive to cooperative and stable labor relations. *Id.*

The Order's findings demonstrate a reasonable relation between the disqualification of contractors who permanently replace their striking workers and the Government's proprietary interests. Moreover, as was the case in *Contractors Association,* the Order contains limitations indicating that the goals of economy and efficiency have been given full consideration.

For example, the contracting agencies can, by filing a written objection, veto the termination of existing contracts. *Id.* at 13024 (§ 3(b)). They can also do business with an employer that the Secretary has disqualified if the contracting agency determines that there are compelling reasons to do so. *Id.* (§ 4(a)). Finally, disqualification of employers is limited to those organizational units of a Federal contractor that the Secretary finds to have permanently replaced lawfully striking employees, *id.* (§ 4(b)), and ends when the Secretary determines that the labor dispute leading up to the permanent replacement has been resolved, *id.* (§ 4(c)).

In challenging the inadequacy of the nexus between the provisions of the Order and the statutory goals of economy and efficiency, Plaintiffs are reiterating their fundamental policy and factual disagreements with the President. In particular, they dispute the validity of the conclusion that use of permanent striker replacements increases the duration of strikes, undermines cooperative labor relations, and decreases the quality and reliability of goods produced.

The Court is well aware that there is substantial disagreement over these issues, that the House and Senate have in the past few years held hearings on different approaches to the problem although no legislation has in fact been enacted, and that the debate itself is rather emotional. But *Kahn* makes clear that, in order to uphold the President's exercise of authority under the FPASA, the validity of his policies (as embodied in directives or executive orders) need not be established by empirical proof.

Nothing could have been more controversial than the long-term efficacy of wage and price controls imposed by President Carter to curb the inflation which was soaring at the time the Executive Order was issued. The *Kahn* court did not address the economic merits of whether price and wage controls decrease costs or increase quality of goods produced for the government; to the contrary, it specifically rejected the "possible

result" feared by the District Court that the government would be forced by the Executive Order to pass over the lowest bidder if that bidder was not complying with the guidelines. Rather, *Kahn* focused its attention on the relationship—or nexus—between the action the President was taking in his Executive Order and his statutory authority to promote economy and efficiency in government management. So long as the policy adopted by the President is premised on and related to such economy and efficiency, the wisdom and merits of the policy *per se* are not to be evaluated by the court.

The reason for that approach is clear. It is the task of elected officials to make those policy choices—provided a statutory basis for them exists. The words of Chief Justice Rehnquist in *Dalton v. Specter*, —— U.S. at ——, 114 S.Ct. at 1728, although written in a different context, are apt: "How the President chooses to exercise the discretion Congress has granted him is not a matter for our review."

For the reasons stated, the Court concludes that Executive Order 12954 is authorized by the FPASA, and that its provisions are rationally related to providing an economical and efficient system of federal procurement and property management.

IV. *Executive Order 12954 Is Not Subject to the NLRA Pre-emption Doctrine*

■ In the recent case of *Building & Constr. Trades Council v. Associated Builders & Contractors, Inc.,* ("*Boston Harbor*"), —— U.S. ——, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993), the Supreme Court summarized the development of the pre-emption doctrine under the National Labor Relations Act. Whether that well-established doctrine applies to the facts of this case is the key legal determination which must be made.

The Court began its analysis with a discussion of the general principles of pre-emption doctrine and noted, as a preliminary matter,

that the NLRA "contains no express pre-emption provision" and, therefore, that it was "reluctant to infer pre-emption." *Id.* at ——, 113 S.Ct. at 1190. The Court then articulated the two basic principles which it has applied over the years to define those activities that are pre-empted under the NLRA.

■ First, "Garmon pre-emption" forbids state and local regulation [14] of activities that are, arguably, either protected or prohibited under Sections 7 and 8 of the NLRA. *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959); *Wisconsin Dept. of Industry v. Gould, Inc.,* 475 U.S. 282, 286, 106 S.Ct. 1057, 1061, 89 L.Ed.2d 223 (1986). The Garmon pre-emption doctrine protects the exclusive jurisdiction of the National Labor Relations Board to determine the scope of protected and prohibited activity and to administer the statutory scheme of remedies and sanctions. *Boston Harbor,* —— U.S. at —— — ——, 113 S.Ct. at 1194–95.

■ Second, "Machinists pre-emption" forbids state and local regulation of activities that are neither "protected nor prohibited" under Garmon pre-emption, but that Congress intended to be left to the "free play of economic forces." *Lodge 76, Intl. Assn. of Machinists v. Wisconsin Employment Relations Commission,* 427 U.S. 132, 147, 96 S.Ct. 2548, 2556, 49 L.Ed.2d 396 (1976). The Machinists pre-emption doctrine preserves the intentional balance created by Congress "between the uncontrolled power of management and labor to further their respective interests." *Golden State Transit Corp. v. Los Angeles (Golden State I),* 475 U.S. 608, 614, 106 S.Ct. 1395, 1399, 89 L.Ed.2d 616 (1986). It is based on the premise that the NLRA "creates a free zone from which all regulation ... is excluded." *Golden State Transit Corp. v. City of Los Angeles (Golden State II),* 493 U.S. 103, 111, 110 S.Ct. 444, 451, 107 L.Ed.2d 420 (1989).

---

14. It should be noted, preliminarily, that all the cases establishing the parameters of the pre-emption doctrine have involved challenges to the activities of state and local governmental entities. None have directly addressed the pre-emption of federal, and in particular, presidential, activities.

Since neither party to this case is questioning the application of NLRA pre-emption principles to the actions of the President, and in light of the ultimate conclusion reached by the Court on the inapplicability of the doctrine to the facts of this case, it is not necessary to reach that issue.

■ In short, NLRA pre-emption doctrine prevents a State from regulating within a protected zone, whether it be a zone protected and reserved for market freedom, see *Machinists,* or for NLRB jurisdiction, see *Garmon.*

■ However, the pre-emption doctrine applies only when governmental entities are involved in *regulatory* as opposed to *proprietary* activities. *Boston Harbor,* —— U.S. at ——, 113 S.Ct. at 1196. When the government acts as proprietor, rather than as regulator or policy-maker, it is not subject to NLRA pre-emption. *Id.* at ——, 113 S.Ct. at 1195.

In *Boston Harbor,* the Court held that the Massachusetts Water Resources Authority ("MWRA"), an independent government agency charged with the duty of cleaning up Boston Harbor, could require private contractors bidding on its project to enter into a prehire agreement negotiated between the agency's project manager and a council of trade unions—because the MWRA had imposed the requirement in its proprietary capacity. *Id.* at ——, 113 S.Ct. at 1197.

In explaining that its "decisions in the area support the distinction between government as regulator and government as proprietor," *Id.* at ——, 113 S.Ct. at 1196, the Court gave as an example of the latter instances "[w]hen a state owns and manages property . . . [and] must interact with private participants in the marketplace." *Id.* The Court's explanation suggests that the concept of "proprietary" activities is a common-sense one: "proprietary" activities are, quite simply, those commercial undertakings which are a concomitant of the ownership and management of property.

In reviewing its earlier pre-emption decisions demonstrating the importance of the distinction between government as regulator and government as proprietor, the Court emphasized that "[w]e have held consistently that the NLRA was intended to supplant state labor *regulation,* not *all* legitimate state activity that affects labor." *Id.* at ——, 113 S.Ct. at 1196 (emphasis added).

The Court made this point, again, in its analysis of *Golden State I* and *Golden State II.* In the former case, the Court held that Los Angeles could not condition renewal of taxicab franchises, including Golden State Transit's, on the settlement of a labor dispute. Under Machinists pre-emption, the state could not regulate the union's right to strike and the taxicab company's use of its economic power to resist a strike.

Significantly, the *Boston Harbor* court recognized that a

very different case would have been presented had the City of Los Angeles purchased taxi services from Golden State in order to transport city employees . . . In that situation, if the strike had produced serious interruptions in the services the city had purchased, the city would not necessarily have been pre-empted from advising Golden State that it would hire another company if the labor dispute were not resolved and services resumed by a specific deadline. *Id.* at ——, 113 S.Ct. at 1196.

Thus, the Court recognized that this hypothetical would be a "very different case" because Los Angeles would be setting the terms on which it was willing to do business. Setting the terms on which a governmental unit is willing to do business is one concomitant of the ownership and management of property. The Court understood that as owner and manager of property, rather than as regulator or policymaker, government needs to "participate freely in the marketplace," *id.* at ——, 113 S.Ct. at 1197, in the same manner as a private owner and manager of property.

Similarly, the President, in issuing Executive Order 12954, was acting in his capacity as manager of the federal government's property. The federal government, like state and local governments, owns and manages large amounts of property. It too, must interact with private participants in the marketplace. The Executive Order merely specifies one of the terms (refusal to hire permanent striker replacements) on which it is willing to do business. In short, there is no difference between the capacity in which the President is acting in issuing Executive Order 12954, relating to the procuring of government goods and services (see Section 1),

and the capacity in which the MWRA was acting in contracting with various contractors and sub-contractors for the revitalization of Boston Harbor.

Plaintiffs try to distinguish *Boston Harbor* on the ground that the MWRA was acting in a proprietary capacity "because it did the same things that private entities were authorized to do and did do."[15] The simple answer to Plaintiffs' argument is that *Boston Harbor* imposes no such requirement—i.e., that private entities, acting in their proprietary capacity, as part of their negotiations require the agreement included in the Executive Order. Nor is there any indication in *Boston Harbor*, as Plaintiffs insist, that the government must in the course of its market participation act just like the "typical" private participant in order to be acting in a proprietary capacity.[16]

The Court simply noted that the MWRA was insisting on a contractual requirement that private entities "may" exact, that "analogous private conduct would be permitted," and that the state agency was exercising an option that was "available" to private contractors. *Id.* at ——, 113 S.Ct. at 1198.[17] The same is of course true here.[18] Even if private employers have a right, under the NLRA, to hire permanent replacements for economic strikers, *NLRB v. Mackay Radio*

*& Tel. Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938), that does not mean that two private participants in the market place would be prohibited under the NLRA from entering into a contract in which one or both of them gave up that right if they believed it served their economic interests.

In attempting to limit *Boston Harbor's* exemption of proprietary activities from NLRA pre-emption, Plaintiffs rely on *Wisconsin Dept. of Industry v. Gould, Inc.*, 475 U.S. 282, 287–288, 106 S.Ct. 1057, 1061–1062, 89 L.Ed.2d 223 (1986), where the Supreme Court held that the NLRA pre-empted a Wisconsin statute which automatically debarred from state contracts firms which had been found to have violated the NLRA three or more times. However, *Gould* is totally distinguishable because, even though the State of Wisconsin was acting through its procurement power, the state conceded that its purpose was to punish labor law violators and did not even purport to offer a proprietary rationale for its statute.

As the Court itself explained in *Boston Harbor*, —— U.S. at ——, 113 S.Ct. at 1197:

Because the statute at issue in *Gould* addressed employer conduct unrelated to the employer's performance of contractual obligations to the State, and because the State's reason for such conduct was to

---

**15.** See Reply Memorandum of Plaintiffs and Mosler Inc. and Opposition to Defendant's Motions to Dismiss and Defendant's Motions for Summary Judgment, pp. 3 and 25.

**16.** Indeed, it is difficult to imagine how the government would establish how a "typical" private participant acts.

**17.** At oral argument, Plaintiffs questioned the extent of the government's ability, even when acting in its proprietary capacity as a purchaser of goods and services, to impose contract conditions which would force abrogation of NLRA rights. While that weighty issue need not be decided at this time, it may well be that there is a significant analytical difference between requiring those who do business with the government to give up rights (such as the right to belong to a labor union) which fall under the *Garmon* rubric, and requiring those who do business with the government to give up rights to engage in activity which must be left to the free play of economic forces (such as the freedom to hire permanent striker replacements) which fall under the *Machinists* rubric.

**18.** The Supreme Court has also recognized this same distinction between a governmental entity acting as a market participant and a governmental entity acting as a market regulator in the context of challenges to state activities brought under the Commerce Clause. *See White v. Massachusetts Council of Constr. Employers*, 460 U.S. 204, 206, 103 S.Ct. 1042, 1043, 75 L.Ed.2d 1 (1983); *Reeves, Inc. v. Stake*, 447 U.S. 429, 436–437, 100 S.Ct. 2271, 2277, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 809–810, 96 S.Ct. 2488, 2497–2498, 49 L.Ed.2d 220 (1976).

In those cases, as in *Boston Harbor*, the Court's analysis did not require that a governmental entity act in conformity with private practice to be acting as a "market participant." Nor did the Court ask whether the government was acting as a "typical" market participant. Rather the Court fully acknowledged that the government based its market decisions on considerations that might not enter into the proprietary decisions of a "typical" private business.

deter NLRA violations, we concluded: "Wisconsin 'simply is not functioning as a private purchaser of services' ... [and therefore,] for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation."

The Court concluded this explanation by repeating what it emphasized in *Gould*, namely, that it was not saying "that state purchasing decisions may never be influenced by labor considerations." *Id.* (quoting *Gould*, 475 U.S. at 291, 106 S.Ct. at 1063).

Executive Order 12954 does not establish a requirement for contractors that is unrelated to the performance of government contracts nor does it establish any sanction for violation of the NLRA. It is reasonably related to the statutory goals of economic and efficient management of the government. It conditions government contracts on an agreement that private entities "may" exact and that "would be permitted." The Supreme Court cautioned in *Boston Harbor*, that "[i]n the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interest, and where analogous private conduct would be permitted, this Court will not infer such a restriction." *Id.* at ——, 113 S.Ct. at 1198. This Court will follow the Supreme Court's lead, and "not infer such a restriction."

For all the foregoing reasons, the Court concludes that Executive Order 12954 is not subject to the NLRA pre-emption doctrine because its issuance was an exercise of proprietary, rather than regulatory, functions.

## IV. *An Injunction Pending Appeal Is Warranted*

Plaintiffs have requested injunctive, as well as declaratory, relief against the Defendant. Because the Court has concluded that *Dalton v. Specter* precludes judicial review, the Defendant's Motions must be granted and the Complaint must be dismissed. In their final Supplemental Submission, Plaintiffs have requested, in the event of an adverse decision, an order staying enforcement of the Executive Order pending appeal.

The Court has discretion to grant such relief, pursuant to Fed.R.Civ.P. 62(c). In exercising that discretion, it must weigh four factors: (1) the likelihood that the adversely affected party will prevail on the merits of the appeal; (2) the likelihood that the adversely affected party will be irreparably harmed absent an injunction; (3) the prospect that other interested parties will be harmed if the Court grants the injunction; and (4) the public interest in granting the injunction. *Cuomo v. United States Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C.Cir.1985); *WMATC v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977).

This four-part test requires a judicious balancing of all the equities, focusing primary attention on the issue of irreparable harm. As the Court of Appeals has explained, "[t]o justify the granting of a stay, a movant need not always establish a high probability of success on the merits. Probability of success is inversely proportional to the degree of irreparable injury evidenced." *Cuomo*, 772 F.2d at 974.

Upon balancing the four factors cited, the Court concludes that the equities favor granting an injunction pending appeal against the Defendant's enforcement of Executive Order 12954.

As to the first factor, likelihood of success on appeal, the Court has already concluded that on both procedural and substantive grounds, Plaintiffs' challenge to Executive Order 12954 must fail. However, in a case in which the balance of equities sharply favors the party seeking injunctive relief because of the irreparable harm it will suffer, a court clearly has discretion to grant an injunction pending appeal despite the adverse ruling. *WMATC*, 559 F.2d at 844–45. That adversely affected party need only have raised a "serious legal question":

To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e. the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the mer-

its so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus more deliberative investigation. *Id.* (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir.1953)).

The questions raised in this case—in particular, the scope of judicial review of presidential actions taken pursuant to statute and the effect of the NLRA on the President's authority under the FPASA—are sufficiently serious, substantial, and difficult, to make them "a fair ground for litigation and ... more deliberative investigation."

Second, Plaintiffs have demonstrated that they will be subject to irreparable harm "for which there is no adequate legal remedy" if the Executive Order is implemented and they are forced to choose between surrendering the use of an economic weapon integral to the balance of labor relations power established under the NLRA and foregoing government contracts. *Taylor v. Resolution Trust Corporation*, 56 F.3d 1497, 1505–06 (D.C.Cir.1995). Surrender of their ability to use permanent striker replacements will, they contend, harm their ability to operate during an economic strike by altering the balance of power in collective bargaining. On the other hand, giving up the right to all government contracts will constitute a direct and substantial harm to their business. The Court of Appeals has already concluded that the choice forced on Plaintiffs by the mere existence of the Executive Order—"between taking immediate action to their detriment and risking substantial future penalties for non-compliance, presents a paradigm case of 'hardship' ..." *Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100–1101 (D.C.Cir. 1995) (per curiam).

■ While mere economic harm, in and of itself, does not always constitute "irreparable" harm sufficient to warrant equitable relief, *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958), such economic harm can be "irreparable" if it is an enduring restraint on the manner in which a business is conducted rather than simply a temporary economic loss which can be compensated monetarily. *WMATC*, 559 F.2d at 843, n. 2. For example, in *WMATC*, the court found irreparable harm because a limousine tour service was prohibited from converting its operations and establishing a bus tour service.

In the instant case, not only will the inability to hire permanent striker replacements have an enduring effect upon the relative bargaining power of employers and the unions representing their workers, but the Executive Order constitutes a radical departure from long-established prior policy. Entry of an injunction pending appeal will serve the primary purpose of such relief, preservation of the *status quo*.

As to the third and fourth factors, the effect of such injunctive relief on the Defendant and the public interest, the Court concludes that there will be little, if any, adverse effect. As noted above, there will be no disruption to any long-standing, well-established government procurement policy. This is not a "disappointed bidder" case where injunctive relief could substantially delay, interfere with, and increase the costs of essential government services. While economy and efficiency may well be served by implementation of the Executive Order, there is no way to quantify how immediate or concrete those benefits will be.

In conclusion, because Plaintiffs allege they will suffer permanent, irreparable, uncompensable harm to their collective bargaining position and to their ability to operate during an economic strike; because they have raised serious, substantial, and difficult legal questions which are far from free from doubt; and because neither the Defendant nor the public interest will be seriously adversely impacted by the delay in implementation of the Executive Order for the period of time required for the processing of an appeal by the Court of Appeals, the Court concludes that, despite its rulings on the procedural and substantive merits of Plaintiffs' claims, an injunction pending appeal is warranted.